488 S.E.2d 361

**STATE of West Virginia, Appellee,**

v.

**GEORGE ANTHONY W., An Infant Under the Age of 18 Years, and Joann W. O., Parent And/Or Custodian of Said Child, Respondents Below,**

**George Anthony W., An Infant Under the Age of 18 Years, Appellant.**

**STATE of West Virginia, Appellee,**

v.

**STEPHFON W., An Infant Under the Age of 18 Years, and Betty B., Parent and/or Custodian of Said Child, Respondents Below,**

**Stephfon W., An Infant under the Age of 18 Years, Appellant.**

Nos. 23393, 23394.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 1, 1996.

Decided Dec. 13, 1996.

Rory L. Perry, II, Assistant Attorney General, Charleston, for Appellee.

James Robert Amos, D. Conrad Gall, Fairmont, for Appellant George Anthony W.

Frances C. Whiteman, Fairmont, for Appellant Stephfon W.

ALBRIGHT, Justice:

The appellants in this proceeding,[1] George Anthony W. and Stephfon W., who are infants, claim that the Circuit Court of Marion County, acting as the Juvenile Court of that County, erred in transferring them to the adult jurisdiction of the court and in directing that they be tried as adults for the

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

Additionally, these two cases were presented to the Court as separate appeals. Because of the similarity of the issues and the fact that the two cases were so entwined, and because the same law is controlling, the Court has undertaken to discuss them in a single opinion.

murder of Dortha Minor. They also claim that the court should have ruled on the admissibility of, and should have suppressed, certain confessions made by them and should have suppressed certain physical evidence obtained as the result of those confessions. After reviewing the issues presented and the record filed, we conclude that the appellants are correct in asserting that the confessions should be suppressed and that the transfer orders which are apparently based on the confessions should be set aside.

The record in this case shows that the stabbed, strangled, and beaten body of Dortha Minor was found in her home in Fairmont on November 23, 1992. Ms. Minor had previously given money to members of the appellants' family, and early in the investiga-

tion of the crime police officers questioned the appellant Stephfon W.'s mother, Y.B., and aunt, C.W. or C.B.W. or C.B. or C., about it. As a result of the questioning, the aunt, on November 25, 1992, notified the police that Stephfon W., who was then fifteen years old, might have been involved in the homicide.[2]

Stephfon W. had previously been involved in criminal activity, had been adjudicated a delinquent, and had been placed on probation. He had violated the terms of his probation and had failed to appear at a juvenile probation revocation hearing scheduled for approximately 1:00 or 1:30 p.m. on November 25, 1992. As a consequence, a capias was issued for his arrest, and Stephfon was located at around 3:30 p.m.

---

2. At one point in the testimony, the circumstances under which suspicion devolved on Stephfon's family is discussed in the following way:

Q: Okay. You had had some conversations with several of Mr. W ...'s family members, including Ms. B.... What caused you to look in that direction?
A: Well, this isn't the first incident we've had involving Dortha Minor and money and people going to the house and getting money and checks and taking her to the bank. And this group of people, the B...s, had been doing this for quite sometime.
Q: And Stephfon was a—or is a B.... In essence, he's a member of the same family, is that what you're saying?
A: Yes, sir.
Q: So your initial contact was, essentially, to go speak with the B...s, and based upon what—
A: There were other people we talked to who also did the same thing. This was a woman who had given away, what we believe to be large sums of money to people in the community that knew that they could approach her and she would give them money.
Q: Okay, but you fairly quickly had some idea that a member of the B.../B.../W... family might have been involved in this, isn't that true?
A: That's—you can assume that.
Elsewhere it is discussed in the following terms:
Q: Now, was Mr. W...'s mother, Y.B., was she questioned at some time in this case?
A: Y.B.?
Q: Yes. That's Stephfon's mother.
A: Yes, sir. I would have to check the—
Q: You just don't recall now?
A: Well, I would have to check. I'm not sure. I know there were several members of the family questioned.

Q: Let me see if I can—if I showed you your testimony from the first hearing on that issue, would that help jog your recollection?
A: It's been awhile.
Q: Here on page 79 of the December 4th, 1992, preliminary hearing. Start at page 78. My co-counsel tells me there's more there.
A: I believe at that time I stated that she was questioned, yes, sir.
Q: Okay, and she was in fact a suspect?
A: Well, the family—members of the family had gotten money from Ms. Minor over the years.
Q: Had there been other folks that had gotten money from Ms. Minor as well?
A: Yes, sir.
Q: And was one of those C.W., or C.B.W.?
A: Yes, sir.
Q: And was she also questioned?
A: Yes, sir, she was.
Q: And she was a suspect as well?
A: She was one of the people that we talked to because of the prior incidents with Dortha Minor, yes, sir.
Q: And what led you to believe that you should question Stephfon especially?
A: Information I received from C.B.
Q: And what was that information?
A: Basically, that there had been a confrontation when she refused to give Stephfon money on a prior occasion and that Stephfon was running with a group of people she called a gang and that she believed that they were the ones responsible for the act.
Q: Did you inform Stephfon that in fact you had questioned his mother, Y., and his aunt, C., previously?
A: They were with him, sir.
Q: Yes, but I'm saying did you tell him, we've questioned them, we suspected them before?
A: I don't think I made that statement to him, no, sir.

The record does not show any connection between the issuance of the capias and the implication of Stephfon in the murder by his aunt.

However, shortly after the issuance of the capias, Stephfon was taken into custody and was taken to the Fairmont City Police Station rather than to a court or a juvenile detention center. There the city police informed Stephfon that they wanted to talk to him about the Minor murder. Police Chief Ted Offutt read Stephfon his *Miranda* rights and asked him if he knew anything about the murder. He denied any knowledge.

From the police station, Stephfon W. was taken before a judge of the Circuit Court of Marion County for a hearing on the probation revocation question. Upon arriving, a police officer informed the court and the prosecuting attorney that the police wanted to question Stephfon about the murder of Dortha Minor after the hearing. It does not appear that the attorney representing Stephfon in the probation revocation was informed or undertook to advise Stephfon with regard to the questioning or the murder.[3] It ap-

pears that his representation was limited to the probation revocation matter. At the conclusion of the revocation hearing, the court revoked Stephfon W.'s probation and sentenced him to one year at the Industrial Home for Youth at Salem.

Stephfon W. remained at the court for approximately one hour while paper work was being completed. Then, in violation of W.Va.Code § 49-5-16(a), he was escorted back to the city police station by Fairmont City Police officers.[4] At the station, he was placed in an interview room with his mother and aunt. Stephfon's grandmother, Betty B., was never invited into the room, even though she was his guardian and custodian. According to the testimony, she remained in the hallway outside the interrogation room.[5] A police officer spoke with Stephfon briefly, and Stephfon denied being involved in the murder of Dortha Minor. He was then left alone with his mother and aunt, who, as previously indicated, had been suspects in the crime. He was allowed to speak privately with them, and shortly thereafter he in-

3. Stephfon W.'s counsel has explained that he assumed that Stephfon was being taken to the police station to wait for transportation to the detention facility. He commented that although he knew this was not normal procedure, he thought the variation occurred because it was the day before Thanksgiving, and he assumed that representatives from the county sheriff's department were unavailable to transport Stephfon.

4. West Virginia Code § 49-5-16(a) provides that a child under eighteen years of age "shall not be committed to a ... police station." The subsection provides, in its entirety:

A child under eighteen years of age shall not be committed to a jail or police station, except that any child over fourteen years of age who has been committed to an industrial home or correctional institution may be held in the juvenile department of a jail while awaiting transportation to the institution for a period not to exceed ninety-six hours, and a child over fourteen years of age who is charged with a crime which would be an offense of violence which would be a felony if committed by an adult, may, upon an order of the circuit court, be housed in a juvenile detention portion of a county facility, but not within sight of adult prisoners. A child charged with or found to be delinquent solely under subdivision (3), (4) or (5), section four [§ 49-1-4(3), (4) or (5)], article one of this chapter, shall not be housed in a detention or other facility wherein persons are

detained for criminal offenses or for delinquency involving offenses which would be crimes if committed by an adult: Provided, That a child who is adjudicated delinquent under subdivision (5) of said section [§ 49-1-4(5)] and who has violated an order of probation or a contempt order arising out of a proceeding wherein the child was adjudicated delinquent for an offense which would be a crime if committed by an adult may not be housed in a detention or other facility wherein persons are detained who have not been adjudicated delinquent for such offenses.

5. The record reflects the following relating to the grandmother's exclusion from the interrogation room:

Q: Did Mr. ... [Stephfon] or Ms. B ... [his mother] or her sister Ms. B ... W ... [Stephfon's aunt], that you call her now, ask for Ms. B ... [Stephfon's grandmother] to be there when these rights were being read or anything was being signed?
A: No, no one asked me for anyone else to be there or made any requests for Ms. B ... to be there.
Q: Did Ms. B ... make any request to be there at the time?
A: No, sir.
Q: She was available in case either she or anybody else wanted her to come in, is that correct?

formed the police officers that he wished to make a statement.[6] *Miranda* rights were recited to Stephfon, and he made a tape-recorded statement suggesting that George W. had committed the crime in his presence. The statement was concluded at 6:06 p.m.

At 6:30 p.m., after the oral statement was concluded, Stephfon W. and his mother, who was not his legal guardian, executed a "Juvenile Rights and Waiver" form, and shortly thereafter Stephfon W. signed a written transcription of his taped statement.[7]

At around 8:20 p.m., the police, with the assistance of George W.'s mother and his "stepfather", located George at a friend's house.[8] He and his stepfather were then taken to the police station in a police vehicle. His mother followed in her vehicle.

There is no evidence that George was notified that he was not under arrest or free to leave when he arrived at the police station. To the contrary, a Detective Retton indicated that George was not free to leave. Detective Retton's testimony on this point proceeded as follows:

Q:  Now, at the—was George free to leave at 8:20 when this questioning was started?

A:  When it started?

Q:  Yes, sir.

A:  I—that wouldn't have been my decision. I don't know—I don't believe he would have been able to leave.

Q:  Do you know if he would have been able to leave at the conclusion of the interview at 9:05?

A:  At the conclusion, I don't believe he would have been allowed to leave.

At the police station, George was given his *Miranda* rights, and he signed a "Juvenile Rights and Waiver" form.[9] His mother did not sign the portion of the form indicating recognition of the right of George to be taken before a juvenile referee or circuit judge. She did sign the addendum indicating that she was willing to have George talk to police officers. George also agreed to give a taped statement.

When the taping began, Police Chief Offutt again recited *Miranda* rights to George. In the statement, George suggested that Stephfon W. had murdered Dortha Minor and that he had assisted. George also agreed to take the police to search for physical evidence.

6.  The police officer who had spoken with Stephfon was asked what the mother and aunt said. The testimony proceeded as follows:

Q:  And then you left the room for a short time and he talked to his mother and his aunt, correct?
A:  That's correct.
Q:  Did you hear any of their conversation?
A:  No, sir.
Q:  So you don't know if they were telling him, you should tell anything you know or anything of that nature?
A:  I would assume that that's what they were telling him, because they came out and said that he wanted to make a statement about it.

7.  The term "Juvenile Rights and Waiver" form is used somewhat advisedly. The form bore the title "Juvenile Rights and Waiver", but it contained no statement to the effect that the juvenile was specifically *waiving* any rights and did not specifically advise that an attorney would be provided at a juvenile detention hearing under W.Va.Code § 49–5–8(d). It did say:

If you/your child is taken into custody, you/your child is entitled to be taken immediately before a juvenile referee or circuit court judge (in no event can the hearing be delayed until later than the next judicial day) for a detention hearing. The sole issue is whether you/your child will be detained pending further court proceedings.

At that point, there was a signature line for both the juvenile and his "Parent/Guardian/Custodian".

This was followed by an addendum, which stated:

By signing my name below, I am saying that, although I understand those rights above, I am willing (or, as the parent, guardian or custodian, I am willing for my child or ward) to talk to the police officer or other agent of the State of West Virginia or Marion County; and that I do this voluntarily with no undue influence of any kind whatsoever being placed on me.

There were more signature lines for the juvenile and the "Parent/Guardian/Custodian" below this.

8.  Although the "stepfather" was never legally married to George's mother, it appears that he had lived with her for fifteen years and that he had a stepfather-son relationship with George. Therefore, we adopt the term stepfather to refer to him.

9.  This was virtually identical to the "Juvenile Rights and Waiver" form signed by Stephfon W., discussed in note 7, *supra*.

Shortly after George gave his statement, a Detective Retton was directed to remain with Stephfon W. No attempt was made to arrange a detention hearing for him. A Detective Cain, who was involved in the investigation, explained:

[I] didn't think there would be a need to call a Magistrate at that point. It was after hours. It was Thanksgiving eve. We would need a Magistrate, a Prosecutor, a defense attorney, the Department of Human Services. That takes an hour or so to set up. I saw no need to do it. Why not do it when we were all ready, and when we were ready is when I called.

Detective Cain further explained that if a magistrate had been called, "the Magistrate wants the juvenile forthwith. I'm not going to call them and say I'm ready to come when I'm not ready to come."

After George gave his statement, the questioning of Stephfon proceeded, and Stephfon was informed of the differences between his statement and that of George. At length, Stephfon admitted that he stabbed Dortha Minor a couple of times and agreed to give an amended statement.

At 9:36 p.m., Stephfon gave a second statement, which suggested that he was more involved in the murder than was indicated by his first statement. He also suggested where physical evidence involved in the crime might be located.

After obtaining this statement, the police, accompanied by George, his mother and stepfather, conducted a search for the physical evidence. The search was unsuccessful, and the police asked George and his family for permission to search an automobile and their home. The permission was granted, and the search revealed articles of clothing which the police believed were connected to the crime.

With the hope of locating other physical evidence, two other officers took Stephfon W.

and his mother on a further search. This search was conducted with Stephfon's consent and produced a cooking pot and a knife mentioned in the confessions.

At around 10:00 p.m. on this same day, November 25, 1992, George W. was taken to a magistrate court for a detention hearing. Upon arrival, Stephfon W. was already there.

A preliminary hearing was held on December 4, 1992. The State presented evidence to establish probable cause, including the juveniles' confessions and the testimony of officers who were involved in the investigation. Although counsel for Stephfon W. and George W. did not offer evidence, they did cross-examine the State's witnesses. At the conclusion of the hearing, Judge Merrifield, upon findings of fact and conclusions of law, found probable cause to believe that Stephfon W. and George W. had participated in the death of the decedent. He ordered that they be held without bond, pending adjudication of their cases.

On December 16, 1992, the court held a hearing on the State's motion to transfer both juveniles to the criminal jurisdiction of the court. The defense attorneys moved for continuances for both juveniles, stating that they had not had sufficient time to prepare their responses to the State's motion to transfer. Defense counsel for both juveniles appealed to this Court, where we reversed and remanded for a new transfer hearing.[10]

■ On remand, the court held a seven-day hearing. The first four days of the hearing were devoted to the defense counsels' motions to suppress certain evidence, and the last three days were devoted to the State's motion to transfer. By order dated June 14, 1995, the court denied the defendants' motions to suppress and granted the State's motion to transfer. It is from this order that the appellants now appeal.[11]

**10.** *See Matter of Stephfon W.*, 191 W.Va. 20, 442 S.E.2d 717 (1994).

**11.** In the consideration of this case, we employ the standard of review adopted today in syllabus point 2 of *State v. Hosea*, 199 W.Va. 62, 483 S.E.2d 62 (1996), which provides:

The Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession was obtained as result of the delay in the presentment of a juvenile after being taken into custody before a referee, circuit judge or a magistrate when the primary purpose of the delay was to obtain a confession from the juvenile. The factual findings upon which the ultimate question of admissibility is

It appears that both the appellants in the present proceeding are raising issues relating to the failure of the authorities to present them to a judge or other appropriate party for a detention hearing prior to obtaining the statements involved in this case. The duty to provide such is defined by W.Va.Code § 49–5–8(d), which states:

A child in custody must immediately be taken before a referee or judge of the circuit court and in no event shall a delay exceed the next succeeding judicial day: Provided, That if there be no judge or referee then available in the county, then such child shall be taken immediately before any magistrate in the county for the sole purpose of holding a detention hearing. The judge, referee or magistrate shall inform the child of his or her right to remain silent, that any statement may be used against him or her and of his or her right to counsel, and no interrogation shall be made without the presence of a parent or counsel. If the child or his or her parent, guardian or custodian has not retained counsel, counsel shall be appointed as soon as practicable. . . .

Whether the appellants were entitled to such a hearing and whether one was appropriately conducted is of some importance for, under the law of this State, the failure of police authorities to afford a juvenile the appropriate hearing can affect the validity of any confession which results from the failure to conduct such a hearing. As stated in syllabus point 3 of *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985):

Under W.Va.Code, 49–5–8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure

to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.[12]

Under the quoted standards, two relevant questions arise in the present proceeding: The first is whether the appellants were taken into custody without being provided with the hearing required by W.Va.Code § 49–5–8(d), and the second is whether the primary motivation for the authorities' failing to provide such a hearing was to obtain a confession.

In *Ellsworth*, the Court indicated that custody, as used in W.Va.Code § 49–5–8(d), is the equivalent of an arrest. In syllabus point 3 of *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990), another juvenile case, this Court said:

"An arrest is the detaining of the person of another by any act or speech that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest." Syllabus point 1, *State v. Muegge*, 178 W.Va. 439, 360 S.E.2d 216 (1987).[13]

In *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988), this Court explained that, in the juvenile context, an arrest may occur even though a juvenile is not actually taken into custody initially for a crime in issue. In that case, the juvenile was confined in the Ohio State Reformatory for crimes committed in Ohio. West Virginia authorities learned of his whereabouts and lodged a detainer against him so that he would not be released from custody before they could transport him to West Virginia to answer West Virginia charges. Upon being transported to West Virginia, he was not given a

predicated will be reviewed under the deferential standard of clearly erroneous.

12. Quite recently in *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995), this Court revisited *State v. Ellsworth J.R.* In note 6 of *Sugg*, we emphasized:

When analyzing the juvenile prompt presentment standards, we are not as lenient with procedural shortcomings as we are with the adult standards. *See State v. Ellsworth J.R.*, 175 W.Va. at 69, 331 S.E.2d at 508 (consideration of constitutional rights "apply to juvenile

defendants even more forcibly [than to adult defendants] because of their age and immaturity"). Therefore, even brief, unexplained delays are magnified when a juvenile's rights are at issue.

13. *State v. Muegge* has been overruled to the extent that it involves arrests by individuals other than the police. *See State v. Honaker*, 193 W.Va. 51, 454 S.E.2d 96 (1994). In the present case, police officers were plainly involved.

hearing pursuant to W.Va.Code § 49–5–8(d) before a confession was extracted from him. This Court held that noncompliance with the requirement that the juvenile be promptly presented before a judicial officer, as required by W.Va.Code § 49–5–8(d), resulted in the inadmissibility of the confession, if the failure to present was primarily motivated by the decision to obtain a confession from the juvenile. The Court also indicated that the failure to present, under such circumstances, would operate to exclude the confession even where *Miranda* rights had been given and waived.

In examining the present case, the Court believes that the evidence supports the conclusion that both the appellants were held in custody without being presented before a judicial officer, in violation of W.Va.Code § 49–5–8(d), for the primary purpose of questioning them about the murder of Dortha Minor. Clearly, Stephfon W. was not free to leave. Just like the juvenile in *State v. Moss, Id.,* Stephfon was in custody under legal process, but he was detained, just as was the juvenile in *State v. Moss,* for the primary purpose of questioning, rather than being taken immediately to a judicial officer for a W.Va.Code § 49–5–8(d) hearing.

In the case of George W., the record conclusively shows that the police, after obtaining the statement of Stephfon W. implicating George in the crime, made a deliberate effort to locate George W. and, upon finding him, placed him in a police cruiser. Three witnesses in this case testified that George W. was taken by the arms and escorted to the police cruiser and handcuffed. A detective present testified that he was not handcuffed. He was then taken to the police station for interrogation. It is clear that George was not advised that he could walk away from interrogation at any time, and Detective Retton, an officer involved in the case, testified that he did not believe that George was free to leave when he arrived at the police station for questioning.

Recently, in *State v. Jones,* 193 W.Va. 378, 456 S.E.2d 459 (1995), this Court examined the circumstances under which the stop of a person for interrogation by the police

was converted into a custodial detention. The Court indicated that controlling factors were the length, duration, and purpose of the stop; the extent of the questioning; and the location of detention and interrogation. The Court also indicated that limited police investigatory interrogation was allowable when a suspect was expressly informed that he was not under arrest, he was not obligated to answer questioning, and he was free to go. Here, George was detained for a lengthy period of time and questioned extensively. He was detained in a police cruiser and at a police station, and the obvious purpose of the questioning was to explore his involvement in the murder of Dortha Minor and possibly to extract a confession from him. He was not told that he was free to leave.

Accordingly, under the overall circumstances of this case, this Court believes that both Stephfon W. and George W. were in custody within the meaning of our juvenile cases.

The record in the case also conclusively shows that Stephfon W. and George W. were not given W.Va.Code § 49–5–8(d) hearings before the confessions were extracted from them. Stephfon W. was in custody a lengthy period prior to the time he gave his confession, the evidence being that he was arrested at around 3:30 p.m. and that he was giving his statement at 6:00 p.m. Although other juvenile proceedings were conducted in the interim, the Court cannot discern a reason why no effort was made to provide him with the hearing contemplated by W.Va.Code § 49–5–8(d), at least at the conclusion of the revocation proceeding, other than the desire to question him about the murder. Additionally, at the conclusion of the other proceedings, he was taken to the police station for questioning, in plain violation of W.Va.Code § 49–5–16(a), which prohibits detention of a juvenile in a police station. Somewhat similarly, George W. was located sometime between 6:50 and 8:20 p.m., and no effort was given to provide him with a W.Va.Code § 49–5–8(d) hearing. Instead, he, although a juvenile, was taken to a police station, where he was given his *Miranda* rights and where interrogation began.

In sum, the Court believes that both prongs of the *Ellsworth J.R.* test were met with respect to both juveniles. They were both in custody, and it is obvious that the primary purpose of the custody in both cases was interrogation. Additionally, timely W.Va.Code § 49–5–8(d) hearings were not afforded the juveniles.

■ When there is a failure to conduct a timely W.Va.Code § 49–5–8(d) hearing under circumstances such as those in the present case, that is, where the purpose of the delay is to extract a confession, syllabus point 3 of *State v. Ellsworth J.R., supra,* indicates that a confession obtained in the delay is invalid. This is true even where *Miranda* rights have been given and waived. *State v. Moss, supra,* and *State v. Guthrie,* 173 W.Va. 290, 315 S.E.2d 397 (1984). Under the circumstances of this case, the Court believes that the confessions obtained by the police were inadmissible in evidence.

The Court notes that Stephfon W. also argues that, under the fruit of the poisonous tree doctrine, physical evidence in this case discovered as a result of the confessions was inadmissible. *See State v. Mullins,* 177 W.Va. 531, 355 S.E.2d 24 (1987); *State v. Stanley,* 168 W.Va. 294, 284 S.E.2d 367 (1981); and *State v. Canby,* 162 W.Va. 666, 252 S.E.2d 164 (1979).

We cannot discern from the record that the confessions were the only sources leading the police to the discovery of the physical evidence, and it appears that there might have been consents, other than those given by Stephfon W. and George W., which impact on the admissibility of this evidence. In light of the Court's confusion on this point, we believe that, upon remand, the trial court should take such steps as are reasonably necessary to develop the full facts surrounding the seizure of the physical evidence and should then reassess the admissibility of that evidence in light of the law.

■ After examining the record, it is also clear to this Court that the decision to transfer the appellants to the jurisdiction of the circuit court from the jurisdiction of the juvenile court was based upon the confessions. Since the Court believes that the confessions and physical evidence were inadmissible, the decision of the circuit court transferring jurisdiction of the case was based upon improper evidence and must be reversed.

For the reasons stated, the decision of the Circuit Court of Marion County transferring the jurisdiction of these cases is reversed, and the Court declares that the confessions discussed herein were illegally obtained and are inadmissible against the appellants and should be suppressed. The cases are remanded for such further proceedings under the juvenile or criminal jurisdiction of the circuit court as may be appropriate and necessary.

Reversed and remanded.

WORKMAN, Justice, dissenting:

The result reached by the majority is patently absurd. It has stretched the intent of the juvenile procedural protections to the point of shattering. The complexity of this matter has been exaggerated, and the entire predicament boils down to one simple question: were the confessions of these two juveniles legally obtained? The lower court held, quite properly in my view, that they were. A majority of this Court disagreed.

I. Prompt Presentment

The factual recitation undertaken by the majority is quite thorough; its interpretation of those facts, however, is profoundly flawed. The essence of the juveniles' argument is that the requirements of West Virginia Code § 49–5–8(d) (1996) regarding prompt detention hearings for juveniles were not satisfied. Based upon that alleged imperfection in the procedural journey, the juveniles contend that their confessions, given prior to presentment, were inadmissible in their juvenile transfer hearing. This argument, apparently successful in its ability to lead the majority down a primrose path, overlooks several key inquiries. For instance, section 49–5–8(d) provides, in pertinent part, that "[a] child in custody must immediately be taken before a referee or judge of the circuit court and in no event shall a delay exceed the next succeeding judicial day." We expounded upon that requirement in syllabus point three of *State*

*v. Ellsworth,* 175 W.Va. 64, 331 S.E.2d 503 (1985), by stating as follows:

> Under W.Va.Code, 49–5–8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose·of the delay was to obtain a confession from the juvenile.

The juvenile in *Ellsworth* had also challenged the validity of his confession, taken while he was in custody and without counsel or relatives present. Based upon information from the victim's sister-in-law, the police had approached the juvenile, asked his if he would accompany them to the police station, and provided the juvenile with his *Miranda* warnings. 175 W.Va. at 67, 331 S.E.2d at 506. Confronted with some of the statements that the police had obtained, the juvenile confessed to pushing the victim into a quarry. *Id.* "Upon the arrival at the police barracks a short time later, he was again read his *Miranda* warnings and gave a seven-page written statement. He was taken before a magistrate within two and one-half hours after he was initially picked up by the police." *Id.*

The juvenile in *Ellsworth* attacked the confession based upon the prompt presentment statute, 49–5–8(d), as challenged in the present case. Noting that the "language of this provision is not without some ambiguity[,]" the *Ellsworth* opinion endeavors to ascertain the intent of the legislature in creating the presentment scheme. *Ellsworth* recognizes the relevance of West Virginia Code § 49–5A–2 (1996), providing, in pertinent part that "[a] child who has been arrested or who under color of law is taken into the custody of any officer or employee of the State or any political subdivision thereof shall be forthwith afforded a hearing to ascertain if such child shall be further detained." *Ellsworth* concluded that "[t]he purposes of a prompt detention hearing under W.Va.Code, 49–5–8(d), are for a neutral judicial officer to inform the child of his constitutional rights and to determine whether he should be released from custody to his parents or other appropriate

person or agency." 175 W.Va. at 69, 331 S.E.2d at 507.

The pivotal question in the midst of this inquiry is the moment at which this requirement of prompt presentment is triggered. *Ellsworth* noted the "similarity between a juvenile detention hearing and the initial presentment of an adult before a magistrate. . . ." In *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982), for instance, we discussed West Virginia Code § 62–1–5, requiring that an arresting officer "take the arrested person without unnecessary delay before a magistrate," and "pointed out that it was designed to· enable a neutral and detached magistrate to test whether there was probable cause for an arrest when the arrest had been made without a warrant." *Ellsworth,* 175 W.Va. at 69, 331 S.E.2d at 507. "Furthermore, it ensured that a defendant would be promptly advised by a magistrate of the nature of the charge and his constitutional right against self-incrimination and the right to counsel." *Id.*

> All of this was designed to bring a detached judicial officer into the process once an arrest had been made to furnish meaningful protection for a defendant's constitutional rights. These same considerations apply to juvenile defendants even more forcibly because of their age and immaturity. Furthermore, because of the likelihood that a juvenile who commits a serious crime may be transferred to the adult jurisdiction of the circuit court under W.Va. Code, 49–5–10, there is a need to ensure that his constitutional rights are preserved at the initial proceedings.

*Id.*

While holding in syllabus point three of *Ellsworth,* as quoted above, that a confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile, we specifically acknowledged "that in certain situations a confession otherwise proper is not necessarily invalid because it was obtained before the juvenile was brought before a referee, judge or magistrate." *Id.* at 70, 331 S.E.2d at 508. Time consumed in transportation is not counted, and the "State can justify delay by

showing the necessity of performing customary booking and administrative procedures...." *Id.* We concluded in *Ellsworth* that the oral and written confessions were admissible, noting that the written confession was preceded by an additional giving of the *Miranda* rights and the juvenile's waiver of these rights.

Regarding the meaning of the word "custody," in section 49–5–8, we explained in *Ellsworth* that "the term 'custody' is equivalent to an arrest, that is, it must be based upon probable cause where the juvenile is being taken into custody for an act which if committed by an adult would be a crime." 175 W.Va. at 70, 331 S.E.2d at 508. "[T]he grounds for taking a juvenile into custody where the juvenile has allegedly committed a criminal act are the same as for the arrest of an adult. Once such **custodial arrest** of a juvenile has occurred, his right to be immediately taken before a judicial officer arises under W.Va.Code, 49–5–8(d)." *Id.* (Emphasis added). Within the adult context, *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986), concisely defines the moment at which the prompt presentment rule is triggered. Syllabus point two explains that "[o]ur prompt presentment rule contained in W.Va. Code, 62–1–5, and Rule 5(a) of the West Virginia Rules of Criminal Procedure, is triggered when an accused is placed under arrest. Furthermore, once a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is also triggered." Syllabus point three instructs that "[t]he delay occasioned by reducing an oral confession to writing ordinarily does not count on the unreasonableness of the delay where a prompt presentment issue is involved." Syllabus point four further elaborates: "Ordinarily the delay in taking an accused who is under arrest to a magistrate after a confession has been obtained from him does not vitiate the confession under our prompt presentment rule."

The analysis in *Humphrey* proceeded as follows:

In the present case, the defendant voluntarily went with the State police to be interrogated. Several of the State police officers who were involved in the interrogation testified that the defendant was not under arrest initially and could have left at any time of his own free will. Before the interrogation, the defendant was a suspect in the case, but it is not clear, based upon the record, that the police had probable cause to arrest until he orally confessed by stating, "I did it." It was at this point shortly after 9:00 p.m. that the prompt presentment rule was triggered.

*Id.* at 268, 351 S.E.2d at 617.

In syllabus point two of *State v. Hosea,* 199 W.Va. 62, 483 S.E.2d 62 (1996), we explained as follows:

The Court is constitutionally obligated to give plenary, independent, and de novo review to the ultimate question of whether a particular confession was obtained as a result of the delay in the presentment of a juvenile after being taken into custody before a referee, circuit judge, or a magistrate when the primary purpose of the delay was to obtain a confession from the juvenile. The factual findings upon which the ultimate question of admissibility is predicated will be reviewed under the deferential standard of clearly erroneous.

Applying that standard of review, this Court competently navigated the facts and procedural requirements relevant to *Hosea,* a case very similar to the one to which I am presently dissenting. In *Hosea,* the juvenile also challenged the admission of his confession given prior to presentment to a magistrate under West Virginia Code § 49–5–8(d). 199 W.Va. at 69, 483 S.E.2d at 64. The transfer of the juvenile from juvenile jurisdiction to criminal jurisdiction, on the basis of the confession, was also challenged. In affirming the transfer, we found that the confession given prior to presentment was not, in the language of *Ellsworth,* for the primary purpose of obtaining a confession. We noted various legal standards to be applied and observed the following facts:

(1) there was a substantial delay between the time the defendant was taken into custody and the time he was presented to a magistrate in Summers County; (2) prior to the time the defendant was presented before the magistrate in Summers County, a statement was taken from the defendant

in which he described what occurred during the critical times on September 18, 1994; (3) the statement was obtained from the defendant after he had an opportunity to confer in person with his mother and after he was advised of and waived his rights to which he was entitled under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Id.* at 69, 483 S.E.2d at 69. We then quite logically explained that "[b]uilding upon these factual predicates, the issue to address is whether the primary purpose for the delay between the time the defendant was taken into custody and the time of his presentment to a magistrate was to obtain a confession from the defendant." *Id.* We ultimately concluded that issues of the extent of the victim's injuries, the identity of the victim, and notification of the juvenile defendant's mother, were being addressed and we were "convince[d] ... by a preponderance of the evidence that the primary reason for delay was not to obtain a confession." *Id.*

I disagree with the majority on two major elements encompassed within the prompt presentment discussion. First, I disagree regarding the point at which the prompt presentment rule was activated. The triggering event is not upon suspicion, not upon initial questioning, not upon denials of involvement, but only upon the advent of probable cause to arrest. Second, even if the majority had determined that the prompt presentment rule had been triggered, a confession prior to presentment is not invalidated unless the primary purpose of the delay in presentment was to obtain a confession. Either avenue would have resulted in an affirmance of the determination of the lower court.

I am also troubled by the majority's ineffective management of the issue of admissibility of the physical evidence. The majority appears to conclude that the admissibility is an issue for consideration on remand by stating as follows:

> We cannot discern from the record that the confessions were the only sources leading the police to the discovery of the physical evidence, and it appears that there might have been consents, other than those given by Stephfon W. and George W., which impact on the admissibility of this evidence. In light of the Court's confusion on this point, we believe that, upon remand, the trial court should take such steps as are reasonably necessary to develop the full facts surrounding the seizure of the physical evidence and should then reassess the admissibility of that evidence in light of the law.

However, the following paragraph appears to indicate a retreat from that position: "Since the Court believes that the confessions **and physical evidence** were inadmissible, the decision of the circuit court transferring jurisdiction of the case was based upon improper evidence and must be reversed." (Emphasis supplied).

Justice Neely penned a ravishing assault upon the majority the first time it remanded this juvenile matter in *In re Stephfon*, 191 W.Va. 20, 442 S.E.2d 717 (1994), for another juvenile transfer hearing. He accurately noted as follows:

> Both Mr. S.W. and Mr. G.A.W. were given ample opportunity to consult with family members; both were afforded the opportunity to enlist the aid of a lawyer; both were read their juvenile rights and Miranda rights; both, with their parents, signaled their full understanding of such rights and signed knowing and voluntary waivers. Both, accompanied by their parents and relatives, confessed to the homicide and each implicated the other. On the request of the police, both voluntarily took officers to the areas where items of evidence were thrown. Both, after thorough discussions with their lawyers, opted to waive detention hearings. Nowhere is there evidence of threats, promises, illegal or improper inducements or any other form of coercion exerted on either Mr. S.W. or Mr. G.A.W. to make such confessions.

191 W.Va. at 25, 442 S.E.2d at 722.

> Ignoring the almost incontrovertible evidence presented at the preliminary hearing that Mr. S.W. and Mr. G.A.W. committed deliberate pre-meditated cold-blooded murder of a kindly old woman, that their confessions to this murder were made with

all procedural safeguards afforded them, and that the full-blown trial-like transfer hearing that the majority now demands has essentially already occurred, is of record, and is fully transcribed in the preliminary hearing, not only renders what the court orders today redundant and superfluous; it also makes courts look preposterous and adds more fuel to inflame the "get tough on crime" enthusiasts. In plucking from the air procedural technicalities that in this case can only be designed to vindicate the majority's denial reflex, to wit, that children should not have evil intent, the majority's decision is like the thirteenth chime of a ridiculous clock which is not only in and of itself absurd, but casts aspersions on the legitimacy of the other twelve.

*Id.* I must say, I miss Justice Neely sometimes.

## II. Policy Argument

Turning its decision upon the prompt presentment requirements, the majority did not focus upon the evidentiary constraints applicable to a juvenile transfer hearing. An extremely disconcerting trend has insidiously crept into our recent jurisprudence, affording juveniles unwarranted and unnecessary protections at juvenile transfer hearings. Absent a constitutional or statutory requirement, I believe that the presentation of evidence at juvenile transfer hearings should not be subject to the same evidentiary constraints that a trial on the merit demands and that transfer hearings should be treated more in the nature of preliminary hearings and grand jury proceedings.[1] At both preliminary hearings and grand jury proceedings, adherence to the West Virginia Rules of Evidence is relaxed—at least partially due to fact the guilt or innocence of an accused is not to be determined.[2] The purpose of such hearings and proceedings is to ascertain whether, at that time, a particular case against an accused should proceed toward trial. Likewise, the purpose of a juvenile transfer hearing is not to decide the guilt or innocence of a juvenile, but it is to determine whether there is "probable cause to believe" the juvenile proceeding should be transferred to the criminal jurisdiction. W.Va. Code § 49–5–10(d) (1992).[3] I can discern no

---

1. Rule 1101(b) of the West Virginia Rules of Evidence states, in part:

     (b) *Rules inapplicable.*—Unless otherwise provided by rules of the Supreme Court of Appeals, these rules other than those with respect to privileges do not apply in the following situations:
     (1) Preliminary questions of fact.—The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104(a).
     (2) Grand jury.—Proceedings before grand juries.

   Of course, as indicated above, any rules with respect to privileges continue to apply. In addition, evidence obtained in violation of the West Virginia Wiretapping and Electronic Surveillance Act of 1987 is inadmissible. W.Va.Code § 62–1D–6 (1992). *See also* 18 U.S.C. § 2515 (1994) (providing that the contents of any intercepted wire or oral communication and "evidence derived therefrom may [not] be received in evidence in any trial, hearing, or other proceeding in or before any court, [or] grand jury ... if the disclosure of that information would be in violation of this chapter").

2. For instance, in *State v. Haught*, 179 W.Va. 557, 371 S.E.2d 54 (1988), this Court said "the purpose of a preliminary hearing is to determine whether there is probable cause to believe that an offense has been committed and that the defendant has committed it." *Id.* at 562–63, 371 S.E.2d at 59–60. Similarly, in denying an application for a stay of enforcement of a judgment, the Honorable William H. Rehnquist, Justice, stated in *Bracy v. United States*, 435 U.S. 1301, 98 S.Ct. 1171, 55 L.Ed.2d 489 (1978):

     The grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand trial. Because of this limited function, we have held that an indictment is not invalidated by the grand jury's consideration of hearsay, ... or by the introduction of evidence obtained in violation of the Fourth Amendment.... While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that factfinding process, its introduction before the grand jury poses no such threat.

   *Id.* at 1302, 98 S.Ct. at 1172 (citations omitted).

3. West Virginia Code § 49–5–10 pertains to the waiver and transfer of jurisdiction. This section was rewritten in 1995 and amended in 1996. The 1996 version still contains the "probable cause to believe" requirement. W.Va.Code § 49–5–10(d) (1996). In March 1997, the West Virginia Legislature passed Bill 2123 amending the juvenile transfer statutes to eliminate a juvenile's right to an interlocutory appeal of mandatory transfer to adult jurisdiction. Discretionary

persuasive reason to strictly adhere to the rules of evidence at a juvenile transfer hearing when the same evidentiary concerns can be raised at a trial on the merits.[4] Even subsequent to disposition, a juvenile transferred to adult jurisdiction is not necessarily sentenced as an adult. In *State v. Ball*, 175 W.Va. 652, 337 S.E.2d 310 (1985), for instance, we held that circuit courts "have authority under W.Va.Code, 49–5–13(e), and W.Va.Code, 49–5–13(b)(5), to sentence a person who commits a homicide while a juvenile to the Anthony Center for Youthful Male Offenders even though he is sentenced as an adult." *See also State v. Pettrey*, 177 W.Va. 723, 356 S.E.2d 477 (1987). West Virginia Code § 49–5–16(b) (1986 Repl.Vol.) provides:

No child who has been convicted of an offense under the adult jurisdiction of the circuit court shall be held in custody in a penitentiary of this State: Provided, That such child may be transferred from a secure juvenile facility to a penitentiary after he shall attain the age of eighteen years if, in the judgment of the commissioner of the department of corrections and the court which committed such child, such transfer is appropriate: Provided, however, That any other provision of this Code to the contrary notwithstanding, prior to such transfer the child shall be returned to the

sentencing court for the purpose of reconsideration and modification of the imposed sentence, which shall be based upon a review of all records and relevant information relating to the child's rehabilitation since his conviction under the adult jurisdiction of the court.

Thus, "[j]uveniles who are transferred to and convicted under the adult jurisdiction of a circuit court are nevertheless afforded the same commitment and rehabilitation rights as those adjudged delinquent under juvenile jurisdiction." *State v. Highland*, 174 W.Va. 525, 528, 327 S.E.2d 703, 706 (1985). "Accordingly, the legislature has provided at least three alternatives to a sentencing court for the proper disposition of such an individual." *Id.*[5]

Advocates of strict adherence to the rules of evidence contend that, unlike preliminary hearings and grand jury proceedings, juvenile transfers represent a comprehensive change in the way juvenile cases will be examined.[6] Indeed, there can be no doubt the United States Supreme Court considers a juvenile transfer hearing "a 'critically important' proceeding" that "must measure up to the essentials of due process and fair treatment." *Kent v. United States*, 383 U.S. 541, 560, 562, 86 S.Ct. 1045, 1057, 1057, 16

transfers, as designated in West Virginia Code §§ 49–5–10(e)–(g), may still be immediately appealed.

**4.** The events of the present consolidated cases began in November 1992. After four years and two appeals, these cases, at the time the majority opinion was released, had progressed no further than the transfer stage. Not only did these juveniles have to wait for a final resolution of their cases, but we must never forget that the family and friends of Ms. Minor, who was brutally beaten and murdered, must endure these seemingly endless court battles.

**5.** Those three alternatives are explained in *Highland* as follows:

First, under West Virginia Code Sec. 49–5–13(e) (Supp.1984), where a juvenile is transferred and convicted under adult jurisdiction the court may, "in lieu of sentencing such person as an adult," make its disposition under the section 49–5–13 provisions for treatment of juveniles adjudged delinquent. See also West Virginia Code Sec. 49–5–13b(c) (Supp.1984). Second, a sentencing court may initially pro-

ceed under the Youthful Male Offender Act, suspending the imposition of an adult sentence and committing the individual to the custody of Commissioner of Corrections for placement in a rehabilitation center for youthful offenders. See West Virginia Code Sec. 25–4–6 (1980 Replacement Vol.).

Third, as was done in the case at hand, the court may simply sentence the juvenile as an adult. But, as directed by West Virginia Code Sec. 49–5–16(b) (Supp.1984), the court must commit the child to a state juvenile facility rather than ordering the sentence to be served, ab initio, in an adult penal institution. This statute, however, does provide a procedure by which individuals eighteen years or older may be subsequently transferred to an adult penitentiary. It is this statutory procedure which is specifically at issue in this appeal.

*Highland*, 174 W.Va. at 528, 327 S.E.2d at 706.

**6.** In our first encounter with these juveniles, we noted that a "transfer of a juvenile to adult criminal jurisdiction under W.Va.Code, 49–5–10, is a matter of substantially more gravity" than a preliminary hearing. *In re Stephfon W.*, 191 W.Va. 20, 23, 442 S.E.2d 717, 720 (1994).

L.Ed.2d 84 (1966) (citation omitted). However, the Supreme Court cautioned in *Kent* that it did not intend to imply that "the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing," [7] and, in a subsequent decision, the Supreme Court recognized that it "has never attempted to prescribe criteria for, or the nature and quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court." *Breed v. Jones*, 421 U.S. 519, 537, 95 S.Ct. 1779, 1790, 44 L.Ed.2d 346 (1975). In fact, the majority of jurisdictions today do not strictly adhere to procedural and evidentiary rules at juvenile transfer hearings. Monica Franklin Hill, *Applicability of Rules of Evidence to Juvenile Transfer, Waiver, or Certification Hearings*, 37 A.L.R.5th 703, 717 (1996). While I recognize that most courts have held that a juvenile is entitled to the protections of the Fifth Amendment right against self-incrimination at a juvenile transfer hearing, the rules of evidence are not universally applied in a stringent manner. Some jurisdictions have held that the rules of evidence should be relaxed at the juvenile transfer hearing and that even if confessions are illegally obtained, "a judge in a transfer hearing is permitted to consider evidence that might be inadmissible in a criminal trial." *In re D. J.*, 909 S.W.2d

621, 623 (Tex.App.1995). "In a transfer hearing, the rules of evidence are relaxed because the purpose of the hearing is not to determine guilt or innocence but rather to determine if there is probable cause to believe the child committed the offense." *Id.* "Strict rules of evidence are not applied in transfer proceedings because the weight of evidence is judged by whether it would support an indictment for the offense, and a grand jury considering an indictment is permitted to receive evidence that would be inadmissable at an adjudication hearing or trial." *In re J.S.C.*, 875 S.W.2d 325, 330 (Tex.App.1994).

In *State v. Milk*, 519 N.W.2d 313 (S.D. 1994), the court recognized that the legislature had statutorily defined the list of exceptions to the applicability of the rules of evidence, and refused to judicially expand those exceptions to include juvenile transfer hearings. *Id.* at 316. The court reasoned that the "decision to admit hearsay at juvenile transfer hearings should be made via the legislative or rulemaking process." *Id.*[8]

In *State v. Nicholas H.*, 131 N.H. 569, 560 A.2d 1156 (1989), the New Hampshire Supreme Court considered the admissibility of hearsay evidence in a juvenile transfer hearing, addressed the absence of any specific

---

**7.** *Id.* at 562, 86 S.Ct. at 1057; *see also In re Gault*, 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) (reiterating principles espoused in *Kent*.)

A: She was there in the hallway, yes, sir.

**8.** The *Milk* analysis provided a detailed recitation of the varying approaches of several jurisdictions. The following examples are instructive: Ariz.R.Crim.Pro. 5.4(c) (under which juvenile transfer hearings are conducted, and providing that, "The finding of probable cause shall be based on substantial evidence, which may be hearsay in whole or in part" including written reports of experts, documentary evidence without foundation and testimony of witnesses concerning declarations of others); Ill.Comp.Stat. Ann. 705 ILCS 405/5–22(1) ("All evidence helpful in determining [the transfer question under Ill. Comp.Stat.Ann. 705 ILCS 405/5–4(3)(b) ] including oral and written reports, [which] may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing."); Iowa Code § 232.45(5) ("At the waiver hearing

all relevant and material evidence shall be admitted."); Mich.R.Evid. 1101(b)(7) (providing that the rules of evidence "do not apply ... [to] (7) Juvenile court proceedings."); *In re Welfare of T.D.S.*, 289 N.W.2d 137 (Minn.1980) (citing Minn.Stat.Ann. § 260.155(1) which provides that "juvenile court 'hearings on any matter ... may be conducted in an informal manner.' " and quoting Hennepin County Juvenile Court Rule 6.8 ("The court may consider any relevant evidence including hearsay and conclusions[.]")); Ohio Rev.Code Ann. § 2151.26(A)(1)(c) (directing the transfer court to make "an investigation, including a mental and physical examination of the child made by a public or private agency or a person qualified to make the examination ... and consideration of all relevant information and factors[.]"); Wash.Rev.Code Ann. § 13.40.110 (limiting juvenile transfer to felony crimes only, and directing the court to consider, "the relevant reports, facts, opinions and arguments presented by the parties and their counsel."); Wis.Stat. § 48.299(4)(b) ("Hearsay evidence may be admitted [in a juvenile proceeding] if it has demonstrable circumstantial guarantees of trustworthiness."). *Milk*, 519 N.W.2d at 316.

exception in the applicability of the rules of evidence, and concluded:

> In the absence of a clear and specific exemption, we hold that the rules of evidence apply to juvenile certification hearings. Accordingly, we conclude that the hearsay statements [of a witness] were inadmissible and that the district court improperly considered them in making its finding of prosecutive merit under [N.H.Rev.Stat. Ann. § 169–B:24—the juvenile transfer statute].

*Id.* 560 A.2d at 1158. Subsequent to the *Nicholas* decision, New Hampshire's Rules of Evidence were specifically amended to provide that the rules of evidence "do not now apply to juvenile certification proceedings." *See In re Eduardo L.,* 136 N.H. 678, 621 A.2d 923, 930 (1993).

The statutory scheme in West Virginia, codified at West Virginia Code § 49–5–2(j) and (k) (1996), provides that "all procedural rights afforded to adults in criminal proceedings," unless otherwise specified, and "the rules of evidence applicable in criminal cases shall apply" to "all adjudicatory hearings held under ... article [five]...." [9] W.Va. Code § 49–5–2(j)–(k).[10] Although juvenile transfer hearings are not specifically mentioned in either Rule 5.1 or in West Virginia Code § 49–5–2(j) and (k), I believe, as previously mentioned, that juvenile transfer hearings ought to be more closely akin to preliminary hearings than adjudicatory ones and should be treated accordingly.

Thus, I urge the legislative branch, and this Court at an appropriate time, to address this issue and to consider moving toward the trend suggested herein, which will afford both juveniles and the state a fair, but more expedited procedure with regard to juvenile transfer to adult jurisdiction.

---

**9.** Clearly, article five distinguishes juvenile transfer hearings from adjudicatory hearings. *See e.g.* W.Va.Code § 49–5–10(a) (1996) (stating in introductory clause that "[u]pon written motion ... prior to the adjudicatory hearing ... the court shall conduct a hearing to determine if juvenile jurisdiction should or must be waived and the proceeding transferred to the criminal jurisdiction of the court").

**10.** West Virginia Code § 49–5–2(j) and (k) (1996) and provides:

(j) At all adjudicatory hearings held under this article, all procedural rights afforded to adults in criminal proceedings shall be applicable unless specifically provided otherwise in this chapter.

(k) At all adjudicatory hearings held under this article, the rules of evidence applicable in criminal cases shall apply, including the rule against written reports based upon hearsay. The related 1992 version of this provision is contained in West Virginia Code § 49–5–1(d) (1992).