488 S.E.2d 53

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Darrell Eustace SAMPSON, Defendant Below, Appellant.**

**No. 23548.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 28, 1997.

Decided May 30, 1997.

Victor S. Woods, Assistant Attorney General, Charleston, for Appellee.

Kelly Elswick, Howley & Venezia, Grantsville, for Appellant.

PER CURIAM:

Darrell Eustace Sampson appeals from an October 27, 1995, final order of the Circuit Court of Calhoun County in which he was convicted on six counts relating to theft of tanks of nitrous oxide from Calhoun General Hospital. He assigns numerous errors, none of which has merit. Accordingly, we affirm.

In November, 1994, the Appellant, Darrell Sampson, was living with his ex-wife, Sherry Parsons, in a house rented by Sherry Parsons. The Appellant's adult son, Jeffrey Scott ("Scott") Sampson, often stayed in the spare room. On November 13, 1994, Sherry Parsons gave a statement to police implicating herself, the Appellant, and Scott Samp-

son in the theft of cylinders of nitrous oxide ("laughing gas") from a fenced enclosure outside Calhoun General Hospital on two occasions. A search of her house later that day produced two blue cylinders and at least two pairs of wire cutters. The Appellant was indicted on six counts: breaking and entering, petit larceny, and conspiracy to commit breaking and entering with respect to the first event described by Sherry Parsons; and entering without breaking, petit larceny, and conspiracy to commit entering without breaking with respect to the second episode.[1]

Conflicting evidence was presented at trial regarding the underlying events. Sherry Parsons testified that she, the Appellant, and Scott were sitting in her home one evening, when Scott suggested that they steal some gas cylinders and sell them. According to Ms. Parsons, the Appellant found some wire cutters and drove the three of them to Calhoun General Hospital. Parsons stated that she remained in the car while the Appellant and Scott disappeared for a few minutes and returned with three cylinders. They drove to the home of an acquaintance to try to sell him one of the cylinders. When the acquaintance wasn't home, they returned to Sherry Parsons' house. Sherry Parsons testified further that on a second occasion, she, the Appellant, Scott, and Scott's girlfriend, Wendy Fox, returned to the hospital and took two more tanks. During this episode, Ms. Parsons originally told police that she and Wendy Fox stayed in the car, but testified at trial that they stood near the hospital doors as lookouts, and could see the two men cross the roof of the hospital.

Scott Sampson testified to a completely different course of events. He said that he met two men named Tim and Bob while out walking one night. The men asked him if he knew of a place where they could drink beer without being bothered by police. Scott took them to the house where Sherry Parsons and the Appellant lived. After drinking some beer, one of the men went out to the car and

brought in the cylinders of nitrous oxide. The three inhaled nitrous oxide, and Tim and Bob later left the house, leaving the cylinders behind. The Appellant testified that he first saw the cylinders in the house the next morning. He said he had been aware of Scott and some other people in the living room late the night before, and saw the cylinders in Scott's bedroom the next morning. Both the Appellant and Scott denied ever stealing cylinders from Calhoun General.

There was uncontradicted testimony that the tanks were kept in the spare bedroom at Sherry Parsons' house, where Scott Sampson slept. Scott also admitted using the nitrous oxide himself, but all witnesses agreed that the Appellant never used it. Several witnesses testified about a third evening when Scott invited some friends over and everyone tried the nitrous oxide. These witnesses stated that although the Appellant and Sherry Parsons were present during this evening, they did not inhale the gas. Three witnesses testified regarding Ms. Parsons' reputation for lack of truthfulness. After hearing this evidence, the jury returned a verdict of guilty on all six counts.

The Appellant assigns the following errors: (1) the trial court failed to strike two jurors for cause; (2) the chain-link enclosure where the cylinders were kept was not a "building" within the meaning of the statute defining breaking and entering; (3) the gas cylinders recovered from the home of Sherry Parsons were not properly authenticated and should not have been admitted into evidence; (4) a jury instruction regarding inferences to be drawn from the fact of exclusive possession was not warranted by the evidence; and (5) the sentence imposed by the court was disproportionate to the crime. We address these errors below.[2]

The Appellant objects first to the trial court's failure to strike for cause prospective juror Fitzwater. Ms. Fitzwater had been

---

1. The second event was termed breaking without entering because there was already a hole cut in the wire enclosure.

2. The Appellant also asserts that the State failed to present a prima facie case, that there was

insufficient evidence to support the verdict, and that the verdict was contrary to the weight of the evidence. We find that these errors are not supported by the record and therefore have no merit.

working eight hours per week as a pharmacy technician, paid by the hour, at Calhoun General Hospital. Although her employment was not full-time, Ms. Fitzwater had worked for Calhoun General for twenty-one years. Appellant's counsel moved to strike her for cause based on her employment by the alleged victim. The court refused this request and counsel used a peremptory strike to eliminate this prospective juror.

■ The Appellant asserts that Ms. Fitzwater should have been disqualified for cause, because she was an employee of a the alleged victim. West Virginia Code section 62–3–3 (1992) requires a panel of twenty jurors "free from exception." *See State v. West,* 157 W.Va. 209, 217, 200 S.E.2d 859, 864 (1973). This Court has said that the true test of whether a juror should be struck for cause is whether that juror can render a verdict based solely on the evidence. The trial court is afforded considerable discretion in this determination, and we will reverse the trial court's decision only if there has been an abuse of discretion. *State v. Phillips,* 194 W.Va. 569, 588, 461 S.E.2d 75, 94 (1995). We have also said that each case must be evaluated on its own facts. *West,* 157 W.Va. at 219, 200 S.E.2d at 865.

The Appellant asserts that an employee of the alleged victim is prima facie disqualified under the decision of this Court in *State v. Dushman,* 79 W.Va. 747, 91 S.E. 809 (1917). In *Dushman,* this Court determined eighty years ago that railroad employees were prima facie disqualified from acting as jurors in a criminal trial involving a theft of railroad property. *Id.* at 750, 91 S.E. at 811. The *Dushman* Court reasoned that the employees of a victimized company would have an interest in the outcome of criminal trials relating to stolen company property, and should therefore be presumed to be biased.

In *West,* this Court addressed the issue of whether employees of State government should be disqualified from serving on juries in criminal trials, where their employer, the State of West Virginia, is a party. There, the Court said,

> The proliferation of responsibilities undertaken by the State and local governments and the historical tendency for the proportion of governmental employees to increase in society, cause us to doubt that all employees of State government are *prima facie* disqualified to sit as jurors in a criminal case. Each case must be evaluated on its own facts; however, we do hold it reversible error to permit a challenged juror who is an employee of the Department of Public Safety, a law enforcement arm of the State, to be a member of a panel of twenty. Obviously, by virtue of the prospective juror's association with enforcement officials he is subject to potential prejudice and peremptory challenges should not be required to disqualify.

*Id.* at 219, 200 S.E.2d at 865. The State asserts that if not all employees of State government are subject to challenge for cause in cases in which the State is a party, then the employees of crime victims should similarly not be automatically excluded.[3]

■ In the case before us, we cannot say that the trial court abused its discretion in denying the Appellant's motion to challenge prospective juror Fitzwater for cause. *Dushman* is distinguishable, because this case does not involve a full-time employee.[4] Furthermore, *Dushman*'s prima facie exclusion of employees may have outlived its value, and the analysis in the *West* case may be more the modern trend on this issue. However, because the instant case is distinguishable from *Dushman,* we need not directly

---

3. The State also refers the Court to *Scott v. Commonwealth,* 1 Va.App. 447, 339 S.E.2d 899, 902 (1986), in which the Court of Appeals of Virginia held that a prospective juror was not per se disqualified by his employment by the grocery store that was the victim of the alleged crime. *See also United States v. Brown,* 644 F.2d 101, 102 (2d Cir.1981) (prospective juror who was employed by another branch of victim bank in bank robbery prosecution not subject to automatic exclusion for cause). The courts in these cases

concluded that employment alone, without further evidence of prejudice, did not require automatic exclusion.

4. We note that the circuit court in the case before us did excuse for cause a full-time employee of the hospital, who stated that she was a business manager and had heard the case discussed at work.

address the continued viability of *Dushman* at this time.

As an hourly employee, working only eight hours per week for a large hospital, Ms. Fitzwater had no cognizable financial interest in the outcome of the case. Ms. Fitzwater stated during voir dire that she worked at the hospital, but didn't know anything about the events in question. When defense counsel asked her if her employment at the hospital would prejudice her in any way, she replied that it would not. The trial court conducted an appropriate inquiry and was satisfied that Ms. Fitzwater could render a verdict based on the evidence. Under these circumstances, we find no error in the trial court's decision not to strike.

The Appellant raises a related assignment of error with respect to prospective juror McCroskey. Mr. McCroskey had worked as an officer of the Grantsville City Police at one time. At the time of trial, however, he had resigned from the police force and worked full-time as a water plant operator. He was still an auxiliary officer for the city police force, but had not been called in ten months. McCroskey was not involved in the investigation of this crime, which was conducted by the state police. When asked if he might be prejudiced in favor of the State, he responded, "I don't really think so, but I always try to be fair." The Appellant moved to strike for cause, and the court refused, noting that being a former police officer did not automatically require exclusion, that McCroskey had not been called up as an auxiliary officer in ten months, that he did not know the investigating officers well, that state and city police operate separately, and that the juror expressed a willingness to be fair.

■ This Court held in syllabus point five of *West,* that "[i]n a criminal case it is reversible error for a trial court to overrule a challenge for cause of a juror who is an employee of a prosecutorial or enforcement agency of the State of West Virginia." We subsequently held, in *State v. White,* 171 W.Va. 658, 661–62, 301 S.E.2d 615, 618

(1983), that the trial court did not err in refusing to strike for cause a former deputy sheriff, where the venireman testified that neither his former position nor his acquaintance with the investigating officer would affect his impartiality. *Accord, State v. Deskins,* 181 W.Va. 112, 380 S.E.2d 676 (1989) (no error in failing to strike for cause former member of military police and former police officer in another jurisdiction). Based on the latter authorities, we conclude that the trial court did not abuse its discretion by refusing to strike Mr. McCroskey for cause.

The Appellant next alleges that his conviction for breaking and entering was improper because the chain link enclosure where the cylinders were kept was not a "building." The statute defining breaking and entering, or entering without breaking, refers to "any office, shop, storehouse, warehouse, banking house, or any house or building, other than a dwelling house or outhouse adjoining thereto or occupied therewith...." W.Va.Code § 61-3-12 (1992). The record reflects that the nitrous oxide tanks were stored in an enclosure that has a concrete floor, two brick walls (exterior hospital walls), two walls of chain link fence including a locked door, and a roof made of chain link fence. The enclosure was entered by cutting a hole in the chain link roof.

■ The circuit court gave the following instruction: "The Court instructs the jury that "building" means a structure designed for habitation, shelter, storage, trade, manufacture, religion, business, education, and the like; A structure or edifice inclosing [sic] a space within its walls, and usually, but not necessarily, covered with a roof." The Appellant did not object to this instruction, and therefore waived his right to raise this issue on appeal. "When objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syl Pt. 1, *State Rd. Comm'n v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964).[5]

---

5. By so holding, we do not suggest that the instruction was an inaccurate statement of the law. We have concluded only that we will not

address the issue because no objection was made at trial.

The Appellant next complains that exhibits 6 and 7, the cylinders seized from Sherry Parsons' house, were not properly authenticated, because none of the witnesses could testify that these particular cylinders were the property of Calhoun General. West Virginia Rule of Evidence 901(a) provides that the requirement of authentication is satisfied by evidence sufficient to support a finding that the item is what its proponent claims. Sherry Parsons described the thefts and identified the tanks as the ones taken from her home. The acting administrator of the hospital testified that Calhoun General rented tanks of the same size and color from Virginia Welding, and that there were five cylinders missing. A second hospital employee testified that they looked identical to the hospital's tanks. This testimony, taken together with that of Ms. Parsons, is sufficient to support the jury's finding that the tanks were those taken from Calhoun General, and the trial court did not err in admitting the tanks into evidence.[6]

The next assignment of error is the following instruction, given by the trial court over Appellant's objection:

Before the possession of stolen property creates even a presumption that the person in possession is a thief, the State must prove by the evidence beyond all reasonable doubt that the possession was personal, exclusive, recent, unexplained, and that it involved a distinct and conscious assertion of property by the defendant.

See *State v. Craft,* 165 W.Va. 741, 749, 272 S.E.2d 46, 51 (1980). The Appellant asserts that there was insufficient evidence of exclusive possession to warrant this instruction, and that it was confusing and misleading. The Appellant asks that we reverse the trial court based on *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). In syllabus point four of *Guthrie,* this Court articulated the standard of review for jury instructions:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not [misled] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

The Appellant does not complain that the instruction misstated the law, but rather that it was not supported by the evidence and was misleading to the jury. With respect to evidence that would support the inclusion of this instruction, there was testimony by several witnesses that nitrous oxide tanks were kept in the spare bedroom of the house that the Appellant shared with Sherry Parsons. The State points out that "exclusive possession of recently stolen property may include joint possession by two or more persons," quoting *State v. Wilcox,* 169 W.Va. 142, 148, 286 S.E.2d 257, 261 (1982). Based on the confessed location of the tanks, we cannot find that it was an abuse of discretion for the trial court to include an instruction on exclusive possession. Moreover, the instruction given actually operated to the benefit of the accused, by requiring the State to prove beyond a reasonable doubt that the defendant consciously asserted possession over the stolen property before the jury could consider that possession as tending to prove his guilt. Thus we do not find that it was misleading. Looking at the entire instruction in the context of the evidence adduced at trial, we find that including the instruction was not an abuse of discretion by the trial court.

The final assignment of error is that the sentence imposed by the trial court was disproportionate to the crime of stealing cylinders of nitrous oxide. The Appellant was

---

**6.** The Appellant also asserts that the tanks were not relevant, and that if relevant their prejudicial nature outweighed their probative value and they should have been excluded under West Virginia Rules of Evidence 402 and 403. We also find these contentions to be without merit.

convicted and sentenced on six counts, as follows:

| Count 1 | Breaking and entering | 1-10 years |
| Count 2 | Entering without breaking | 1-10 (concurrent with count 1) |
| Count 3 | Petit larceny | 45 days (consecutive) |
| Count 4 | Petit larceny | 1 year (concurrent) |
| Count 5 | Conspiracy to commit count 1 | 1-5 years (consecutive) |
| Count 6 | Conspiracy to commit count 2 | 1-5 years (consecutive) |

This produced a minimum sentence of three years, forty-five days, and a maximum sentence of twenty years, forty-five days. The Appellant asserts that consecutive sentencing for these related counts was an abuse of discretion. He complains that the sentence imposed is disproportionate to the crime of stealing gas cylinders worth only five hundred dollars, in a theft that the victim did not even notice until Sherry Parsons reported it to the police.

This Court held in syllabus point 4 of *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982), that "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." This Court upheld consecutive sentences in a similar situation in *State v. Farr*, 193 W.Va. 355, 456 S.E.2d 199 (1995), in which a defendant convicted on three counts of breaking and entering was sentenced to three consecutive one-to-ten year sentences. There the Court noted that constitutional proportionality standards are generally only applicable to sentences where there is either no fixed maximum set by statute or where there is a life recidivist sentence. *Id.* at 357, 456 S.E.2d at 201, quoting Syl. Pt. 4, *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981). We therefore find no error in the sentence imposed by the trial court.

Based on the above, we affirm the defendant's conviction.

Affirmed.

STARCHER, Justice, dissenting:

I respectfully dissent to the majority opinion. My dissent is based on two propositions which appear to me to be common sense.

First, a cage made out of fencing is not a building.

I have worked as a carpenter since I was old enough to pick nails out of a box for my dad. I have built several houses myself, and worked on many, many more. I have built sheds, barns and chicken houses. For a number of years I have spent my vacation building homes for low-income people with President Jimmy Carter and Habitat for Humanity. I also have wired and plumbed many buildings. I know what people mean when they use the word "building." They do not mean a wire cage, nor do I believe the Legislature meant a cage when drafting our criminal statute on breaking and entering.

If I told my twelve-year-old niece to "fetch a jug of water out of the building around back," and all she saw was a wire cage, she'd probably have enough sense to get the jug, but when she came back, she'd tell me: "Uncle Larry, I didn't see any building back there; all I saw was a cage or fenced-in place." And she'd think her Uncle Larry was being sloppy in his language, which a busy carpenter is entitled to do every now and then.

But a court of law isn't entitled to twist words to mean what everyone knows they don't mean. A wire cage is not a building, even if it is along side a building.

Second, a fair jury pool in a criminal case does not include police officers and employees of the victim.

The one challenged juror was not just a former police officer; he was a former chief of police and a current auxiliary officer whose services had been and would likely be used in the future in local law enforcement. In fact, his police officer services were available at the very time he was sitting as a juror. The other challenged juror, the hospital employee, would have to defend the jury's verdict before the victims of the theft—her bosses. The law has historically and wisely given a defendant the right to object to such jurors, and this right should have been en-

forced. And, these matters are particularly important in a small community as we have in this case.

I am mindful of the recent O.J. Simpson cases which have sent a terrible message to most Americans—that justice is a game, and that the verdict depends not on the evidence, but on the biases in the jury pool. To try to send an opposite message, it is imperative that we *reduce* the reasons for people to feel that they cannot get a fair trial because of perceived biases in the jury pool. The holding of the majority does nothing to attack the cynicism that the O.J. case has bred.

We have spoken of the importance of fairness and the need to avoid even the appearance of impropriety on the civil side of our courts; those concepts are equally important to the criminal side. This Court has recently held:

> The legal system will endure only so long as members of society continue to believe that our courts endeavor to provide untainted, unbiased forums in which justice may be found and done. The right to a fair and impartial trial is fundamental to a litigant; fundamental to the judiciary is the public's confidence in the impartiality of our judges and proceedings over which they preside.... avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself. *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 108–109, 459 S.E.2d 374, 384–85 (1995).

The defendant was probably guilty of larceny, but not guilty of breaking and entering a building. And the jury pool was so constituted as to permit fair-minded people to conclude that the deck was stacked against the defendant. Accordingly, I dissent.