679 S.E.2d 675

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Paul NEWCOMB, Defendant Below, Appellant.**

**No. 34142.**

Supreme Court of Appeals of West Virginia.

Submitted March 24, 2009.

Decided June 23, 2009.

---

Darrell V. McGraw, Jr., Esq., Attorney General, R. Christopher Smith, Esq., Assistant Attorney General, Charleston, for Appellee.

Dwayne J. Adkins, Esq., Logan County Public Defender, Logan, for Appellant.

WORKMAN, Justice:

This case is before this Court upon appeal of a final order of the Circuit Court of Logan County entered on August 3, 2007. In that order, Paul Newcomb (hereinafter "the appellant") was sentenced to life imprisonment without a recommendation of mercy for his conviction of first degree murder. In this appeal, the appellant asserts that the circuit court committed error in failing to strike two jurors for cause; that the murder weapon as well as certain statements made to an emergency medical technician (EMT) should have been excluded from the trial because of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) violations; that his statement to the police officers should have been excluded because of a prompt presentment violation; and that there was error in the admission of Rule 404(b) evidence regarding an earlier altercation. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, we are of the opinion that the circuit court did not commit reversible error and, accordingly, affirm the decision below.

## I.

### FACTS

On April 1, 2006, near Christian, West Virginia, the appellant, Paul Newcomb, stabbed to death Dennis Toler at Mr. Toler's home. The appellant admitted stabbing Mr. Toler two to three times; however, Dr. Zia Sabet, a Deputy Chief Medical Examiner for the State of West Virginia, testified that he discovered thirteen stab wounds to the victim, including three in the left side of his neck, five in the front of his chest, and five in his back. There were numerous other wounds, incisions, scratches, and abrasions throughout Mr. Toler's body.

This case arises from an ongoing affair between the appellant's wife, Johnna Newcomb, and Mr. Toler. Ms. Newcomb became

addicted to OxyContin after suffering injuries from a car accident and was sent to a drug rehabilitation center. During her initial addiction period from approximately 2004 until the time of Mr. Toler's death, Ms. Newcomb testified that she would leave her home and often be gone for days and even weeks taking illegal drugs. It was during this time period when she met Mr. Toler. She testified that while standing in line at a methadone clinic in Williamson, West Virginia, Mr. Toler approached her and asked if she was interested in purchasing methadone. Eventually Ms. Newcomb began dating Mr. Toler and providing sexual favors in exchange for additional doses of methadone. On numerous occasions during this time period, Ms. Newcomb left the appellant and their two children and stayed with Mr. Toler.[1]

According to trial testimony, the appellant and Mr. Toler had several altercations prior to Mr. Toler's death. On one such occasion, on September 30, 2005, the appellant confronted Ms. Newcomb and Mr. Toler outside of the methadone clinic. The appellant asked Mr. Toler if he liked being with the appellant's wife, and then began stabbing him. As a security guard from the clinic approached, the appellant left the scene and Mr. Toler went inside the clinic for treatment of his stab wounds. The record is not clear on the extent of Mr. Toler's injuries at that time; however, this incident was approximately five months prior to the date of the April 1, 2006, fatal stabbing of Mr. Toler by the appellant.[2]

On the day before the April 1, 2006, murder, which is the subject of the current appeal, the appellant had a telephone conversation with Ms. Newcomb. She had been staying at Mr. Toler's house for approximately one week on this occasion and informed the appellant that she wanted to return home because of their son's approaching birthday. The appellant agreed that he would pick her up the next morning and take her to the methadone clinic and then to their home.

During the early morning hours of April 1, 2006, the appellant was drinking at a bar in Man, West Virginia. After the closing of the bar, the bar owner drove the appellant to the Elk Creek area. Soon thereafter, the appellant began walking along the railroad tracks until he saw his wife come out of Mr. Toler's house. As he approached the house, Mr. Toler came outside and a verbal confrontation between him and the appellant ensued.

Ms. Newcomb attempted to keep the two men apart and testified that she was unintentionally stabbed by the appellant. The appellant and Mr. Toler began fighting in the yard, which led to the porch, and eventually into the house. Mr. Toler lived with his parents; however, he stayed in a closed-off section on the bottom floor of his parents' house. As Mr. Toler's parents heard the fight, his mother opened a door to let her son into their portion of the house. She testified that the appellant followed him and stabbed him again. She said that Mr. Toler was holding his back and side and went to the bed where his father was located. He later died in his parents' living room. Mr. Toler's father testified that there were large amounts of blood throughout the house including the walls, the upstairs and downstairs bedrooms, the living room, and the kitchen.

Soon after the stabbing, Logan County Deputy Sheriff Weston Harvey arrived on the scene and found Ms. Newcomb pointing to the appellant and yelling, "There he is. There he is." He later heard the victim's parents screaming the same thing. At this point, Deputy Harvey noticed the appellant coming toward him. Deputy Harvey then ordered the appellant to get on his knees and have his hands out where they were visible. At first, the appellant did not comply with the officer's command, but he eventually did so. Deputy Harvey then handcuffed the appellant and took him to his police cruiser,

1. At the time of trial, the appellant's and Ms. Newcomb's two children were ages eleven and twelve.

2. The appellant was initially charged for malicious assault for the September 30, 2005, stabbing of Mr. Toler. While those charges were dismissed without prejudice, police officers testified that they planned to reinstate them at a later time.

stating that the appellant was being combative.

Deputy Harvey testified that he did not immediately place the appellant under arrest because he had just arrived at the scene and did not know the underlying circumstances at that point in time. Nonetheless, based on the appellant's behavior, as well as proper police protocol, he stated that he placed handcuffs on the appellant for safety reasons. It was after being handcuffed that the appellant made several statements that are at issue in this appeal. Those statements will be discussed individually below.

At trial, the appellant argued that the stabbing of Mr. Toler was in self-defense. On cross-examination by the prosecutor, however, the appellant admitted that he had made an initial aggressive move toward Mr. Toler. He stated that he went toward Mr. Toler with his knife because he thought he was trying to obtain a weapon from behind the door of the entrance to his home. The circuit court gave a self-defense instruction. However, on August 3, 2007, the appellant was found guilty of first degree murder without a recommendation of mercy. This appeal followed.

## II.

## STANDARD OF REVIEW

The appellant has presented several assignments of error for our review. Initially, he contends that the circuit court committed error by failing to dismiss two potential jurors for cause. The appellant also claims that the murder weapon, as well as certain statements, should have been excluded from the trial, that there was a prompt presentment violation, and that there was error in the admission of Rule 404(b) evidence. In Syllabus Point 1 of *State v. Paynter,* 206 W.Va. 521, 526 S.E.2d 43 (1999), this Court held, "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995). This Court has also indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. Syllabus Point 1, *State ex rel. Hechler v. Christian Action Network,* 201 W.Va. 71, 491 S.E.2d 618 (1997).

More specifically, with regard to whether a trial court committed error in refusing the appellant's motions to strike potential jurors for cause, this Court articulated the standard of review in *State v. Miller,* 197 W.Va. 588, 600–601, 476 S.E.2d 535, 547–548 (1996), holding:

In reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court.

*See State v. Wade,* 200 W.Va. 637, 654, 490 S.E.2d 724, 741 (1997); and Syllabus Point 2, *State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219 (1987). In Syllabus Point 4 of *Miller,* this Court further held:

The relevant test for determining whether a juror is biased is whether the juror had such a fixed opinion that he or she could not judge impartially the guilt of the defendant. Even though a juror swears that he or she could set aside any opinion he or she might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if the other facts in the record indicate to the contrary.

197 W.Va. 588, 476 S.E.2d 535. *See also* Syllabus Point 11, *State v. Salmons,* 203 W.Va. 561, 509 S.E.2d 842 (1998).

This Court has also stated: "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus Point 1, *State v. Calloway,* 207 W.Va. 43, 528 S.E.2d 490 (1999). With these standards in mind, the assigned errors will be examined.

## III.

## DISCUSSION

The appellant raises five assignments of error in his appeal to this Court. Each assignment of error will be discussed, in turn, below.

### A. Prospective Jurors McKnight and White

The appellant maintains in his first assignment of error that he was denied a fair trial due to the failure of the circuit court to excuse prospective juror Krista McKnight and prospective juror Tara White for cause from the juror *voir dire* panel. With regard to prospective juror McKnight, the appellant maintains that a fair reading of the *voir dire* leads to the conclusion that there were a significant number of jurors who believed that police officers should be given a preference over non-police officers insofar as their credibility. The appellant argues, however, that the circuit court was not consistent in striking jurors for cause who illustrated this obvious preconception regarding police officer testimony.

■ According to the appellant, prospective juror McKnight indicated that she was prone to believe police officers over non-police officers and the State was permitted to rehabilitate her in violation of Syllabus Point 5 of *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002), which held that:

> Once a prospective juror has made a clear statement during *voir dire* reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair.

The section of prospective juror McKnight's *voir dire* cited by the appellant is as follows:

Q. By defense counsel: Now do you believe that police officers' testimony should be believed more than non-police officer testimony?

A. Juror McKnight: I would say, yes.

. . . .

Q. By prosecutor: If the Court instructs you that you have to treat each witness equally and listen to what they have to say and judge the evidence based upon what they have to say and judge the evidence based on what you see here on the stand, can you do that?

A. Juror McKnight: Yes, absolutely.

Q. By prosecutor: You had indicated you might tend to believe police officers.

A. Juror McKnight: Right.

Q. By prosecutor: But you can still, if the court instructs you, you're not to give a police officer any more weight than any other witness, can you just wait until you hear what each person would have to say?

A. Juror McKnight: Yes, I can do that.

The appellant maintains that the first answer given by prospective juror McKnight about predisposition illustrates her actual belief and that is why juror rehabilitation is not permitted.

With regard to prospective juror Tara White, the appellant states that she revealed that her in-laws had recently faced murder charges in Logan County and that Ms. White should have been struck for cause because she initially indicated that the case might be too "sensitive" for her. The section of prospective juror White's *voir dire* cited by the appellant is as follows:

Q. By prosecutor: Do you feel like any of them got a raw deal in court because of the police or the prosecutors of the Court system?

A. Juror White: No.

Q. By prosecutor: That would cause you to have a negative opinion about the system itself.

A. Juror White: No, not raw.

. . . .

Q. By prosecutor: I'm asking is either because those people all got in trouble, you think maybe they deserved what they got or not, do you feel like you could push all that aside and just hear this case? And all we're asking for is an honest opinion. If you don't then that's fine, too.

A. Juror White: Well, I'm going to go back to the honesty. I am very, very

sensitive and I don't know if I could, you know, be fairly judgmental.

Q. By prosecutor: When you say "sensitive" do you mean to other criminal acts or-

A. Juror White: I don't know how to explain it to you. Let me see if I can put it in the right words. Something as major as this, I don't know if I could be as fair as I need to be, you know swaying my judgment.

Q. By prosecutor: ... Are you saying because of the kind of case this is?

A. Juror White: Yes.

Q. By prosecutor: So you're saying this is a real serious case, you think.

A. Juror White: Yes.

Q. By prosecutor: Now are you saying just because this is a serious case, that would cause you problems, or are you saying because of these other things that have happened to your in-laws?

A. Juror White: Nothing—putting my in-laws aside, it has nothing to do with them. Just specifically because of the type of case that it is.

. . . .

Q. By prosecutor: ... what are your concerns if I could ask that?

A. Juror White: Just specifically because it is a murder, and I don't know if I could actually handle the whole situation with it. I just don't know.

Q. By prosecutor: Do you feel like you'd be inclined one way or another?

A. Juror White: I'm sure that I could come to a decision. There's no doubt about that. But I know it would be a sensitive issue. Do I make sense?

Q. By prosecutor: Just personally sensitive to you?

A. Juror White: Yes.

. . . .

Q. By defense counsel: ... Ma'am, the prosecutor asked you several questions about your in-laws' case and he even ask [sic] you whether you thought they got a raw deal. Do you feel the opposite, you feel like they should have gotten greater punishment?

A. Juror White: Yes.

Accordingly, the appellant asserts that the circuit court also erred in not dismissing prospective juror White for cause.

Conversely, the State maintains that the circuit court did not abuse its discretion when it denied the motions to strike prospective jurors McKnight and White for cause. It first contends that no rehabilitation occurred with respect to prospective juror McKnight, but rather the prosecutor simply informed her what the law was and what she would be required to do as a juror. The State declares that once she understood this, she indicated that she could make decisions free of any bias.

The State further maintains that the circuit court reviewed each prospective juror closely and struck several of them for cause when they illustrated statements reflecting the presence of a disqualifying prejudice or bias. The State points out that numerous prospective jurors were, in fact, struck for cause by the circuit court due to their preconception that police officer's should be believed more than non-police officers. For instance, prospective jurors Browning, Workman, Fraley, Kubow, Vance, and Sanders, were all struck for cause by the circuit court for their potential bias in favor of police officers. After attempts by the prosecutor to clarify those prospective jurors' initial responses to questions surrounding whether or not they would believe police officers more than non-police officers, the circuit court remained unsatisfied with their responses, and dismissed them for cause. The trial court obviously was conscientious in dismissing potential jurors who appeared to harbor bias which would have preferred the police or prosecution. Prospective juror McKnight, however, when given the opportunity to explain her response to such a question, showed a clear ability to be unbiased.

With respect to prospective juror White, the State argues that further probing indicated that she could indeed be unbiased and that she simply was not speaking clearly in response to the initial questions she was asked. The State contends that prospective juror White's comments at the beginning of her *voir dire* were an indication of an ability

to be unbiased from a juror who admitted to having trouble saying the correct words. When looking at the totality of the circumstances, the State argues that prospective juror White simply expressed a concern about the sensitive nature of murder cases, had trouble communicating, and when probed specifically about bias, stated that she could be impartial. Moreover, while prospective juror White may have believed that her in-laws should have received more severe sentences, the facts and circumstances surrounding the appellant's case are completely unrelated.

■ We note at the outset that while neither juror was struck by the trial court for cause, the appellant exercised peremptory challenges against them so that they were not on the jury that convicted the appellant. Nevertheless, W.Va.Code § 62–3–3 (1949) requires a panel of twenty jurors "free from exception." [3] This Court has previously found "if proper objection is raised at the time of impaneling the jury, it is reversible error for the court to fail to discharge a juror who is obviously objectionable." *State v. West,* 157 W.Va. 209, 219, 200 S.E.2d 859, 866 (1973). Thus, we have held:

> The language of W.Va.Code, 62–3–3 (1949), grants a defendant the specific right to reserve his or her peremptory challenges until an unbiased jury panel is assembled. Consequently, if a defendant validly challenges a prospective juror for cause and the trial court fails to remove the juror, reversible error results even if a defendant subsequently uses his peremptory challenge to correct the trial court's error.

Syllabus Point 8, *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75 (1995).

■ In *State v. Sampson,* 200 W.Va. 53, 57, 488 S.E.2d 53, 57 (1997), citing *State v. Phillips,* 194 W.Va. at 588, 461 S.E.2d at 94, the Court held:

The true test of whether a juror should be struck for cause is whether that juror can render a verdict based solely on the evidence. The trial court is afforded considerable discretion in this determination, and we will reverse the trial court's decision only if there has been an abuse of discretion.

Further, "[w]hen a defendant seeks the disqualification of a juror, the defendant bears the burden of 'rebut[ting] the presumption of a prospective juror's impartiality[.]' " *State v. Phillips,* 194 W.Va. at 588, 461 S.E.2d at 94, *quoting Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751, 756 (1961). In determining whether there has been an abuse of discretion, we must evaluate each case on its own facts. *Sampson,* 200 W.Va. at 57, 488 S.E.2d at 57, *citing State v. West,* 157 W.Va. at 219, 200 S.E.2d at 865.

■ This Court explained in *O'Dell, supra,* that the "object of jury selection is to secure jurors who are not only free from improper prejudice and bias, but who are also free from the suspicion of improper prejudice or bias." 211 W.Va. at 288, 565 S.E.2d at 410. The *O'Dell* Court further commented upon *voir dire* as a tool capable of "ferret[ing] out biases and prejudices to create a jury panel, before the exercise of peremptory strikes, free of the taint of reasonably suspected prejudice or bias." *Id.* at 288, 565 S.E.2d at 410. In *W.Va. Dep't of Highways v. Fisher,* 170 W.Va. 7, 289 S.E.2d 213 (1982), this Court addressed the methodology to be utilized by a trial court in determining whether removal is necessary, explaining as follows:

> "It is not enough if a juror believes that he can be impartial and fair. The court in exercising [its] discretion must find from all of the facts that the juror will be impartial and fair and not be biased consciously or subconsciously. A mere statement by the juror that he will be fair and afford the parties a fair trial becomes less meaningful in light of other testimony and facts which

---

**3.** W.Va.Code § 62–3–3, in part, provides:

> In a case of felony, twenty jurors shall be drawn from those in attendance for the trial of the accused. If a sufficient number of jurors for such panel cannot be procured in this way, the court shall order others to be forthwith summoned and selected, until a panel of twenty jurors, free from exception, be completed, from which panel the accused may strike off six jurors and the prosecuting attorney may strike off two jurors.

at least suggest the probability of bias. The court in exercising discretion must be convinced that a probability of bias of the juror does not exist. The test of a juror's disqualification is the probability of bias or prejudice as determined by the court."

170 W.Va. at 12–13, 289 S.E.2d at 219 (quoting Lambert v. Sisters of St. Joseph of Peace, 277 Or. 223, 560 P.2d 262 (1977)).

■■■ This Court further explained in Syllabus Point 1 of O'Dell that: " 'Actual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed.' Syllabus Point 5, State v. Miller, 197 W.Va. 588, 476 S.E.2d 535 (1996)." In Syllabus Point 2 of O'Dell, we also noted that: " 'Jurors who on voir dire of the panel indicate possible prejudice should be excused, or should be questioned individually either by the court or by counsel to precisely determine whether they entertain bias or prejudice for or against either party, requiring their excuse.' Syllabus Point 3, State v. Pratt, 161 W.Va. 530, 244 S.E.2d 227 (1978)." Then, the Court explained that: "When considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror." Syllabus Point 3, O'Dell. Finally, this Court further resolved that: "If a prospective juror makes an inconclusive or vague statement during voir dire reflecting or indicating the possibility of a disqualifying bias or prejudice, further probing into the facts and background related to such bias or prejudice is required." Syllabus Point 4, O'Dell.

In applying the principles set forth in O'Dell to the case at hand, it is necessary to review the numerous decisions by this Court wherein we considered a circuit court's refusal to strike jurors for cause. For instance, in Thomas v. Makani, 218 W.Va. 235, 624 S.E.2d 582 (2005), this Court considered the impact of O'Dell in a case where a medical malpractice action was brought by a patient who alleged that a physician violated the applicable standard of care. The plaintiff in Thomas appealed a defense verdict, contending that the circuit court abused its discretion by refusing to strike potential jurors who had previously received successful medical treatment from the defendant physician. This Court engaged in the O'Dell analysis and concluded that the trial court did not err in failing to strike the juror for cause.

The prospective juror in Thomas had initially indicated that he might possibly "lean toward" believing the testimony of the defendant physician. 218 W.Va. at 238, 624 S.E.2d at 585. This Court was "unable to conclude that Juror Evans made a clear statement of disqualifying bias toward Dr. Makani sufficient to disqualify him from serving on the jury." Id. at 238, 624 S.E.2d at 585. While this Court found that the "initial comments required further inquiry by the court[,]" the Court further observed that the potential juror had "explained that since he had no medical knowledge, he would more likely believe the doctor who presented the most credible and convincing evidence. He clearly stated that he would not find in favor of Dr. Makani simply because he had treated him fourteen years ago." Id. at 238–239, 624 S.E.2d at 585–586. This Court concluded as follows in Thomas:

> After reviewing the record in this case, we conclude that the trial court took "special care" to determine that Juror Evans was free from bias and prejudice. The trial court clearly considered the totality of the circumstances and conducted a full inquiry before determining that there was no basis to disqualify Juror Evans from serving on the jury.

Id. at 239, 624 S.E.2d at 586.

More recently, in Macek v. Jones, 222 W.Va. 702, 671 S.E.2d 707 (2008), this Court addressed the appellants' contention that the trial court erred in failing to strike prospective jurors David Andrew George and Glen Stolburg for cause. With regard to the alleged bias of prospective juror George, the appellants claimed that he was conspicuously biased against a doctor being sued and that such bias was revealed through his answers

to several questions. The Court explained that:

Question Number Four, for instance, presented the following question to Mr. George: "Can you state that if, after you have heard all of the evidence in this case, you find that the defendant, Dr. Jones, was negligent, you will return a verdict against Dr. Jones?" Mr. George answered: "If I believe that if his guilt is proven beyond a reasonable doubt, I would probably have no choice." When subsequently asked to explain his answer to that question, Mr. George stated, "Well I—maybe part of my philosophy is I try to be as objective as I can possibly be, because I know that the defendant, you know, he's facing something very serious." He continued, "I tend to be kind of sympathetic with people at the same time and—but there could be a good chance I'd say he's guilty [referring to Dr. Jones] too." Mr. George also explained that he did not "see any difficulties in reaching an impartial and unbiased verdict. . . ."

*Id.* at 704, 671 S.E.2d at 709. The appellants in *Jones* also pointed out juror George's apparent identification with physicians who had been subjected to medical malpractice claims in arguing that he should be struck for cause. For instance,

Mr. George was asked, "Have you read, heard or discussed anything about medical negligence actions, lawsuits or a liability crisis?" He answered, "I heard of a doctor in Wheeling who lost a million dollar negligence suit for refusing to listen to the daughter of a patient who was ordered to go home and died there that night." Mr. George later explained that he personally knew the physician who was involved in the case he referenced in his written response. Mr. George stated that he had "sympathy for him" and explained that "[i]t kind of stays with me." He acknowledged that while he tried to be fair, the incident "had some kind of effect on me simply because I knew [the physician]." He further stated that he "couldn't just wipe it clean from [his] memory." Mr. George also explained that his brother, Ned George, was a Wheeling attorney who represents employers in civil litigation.

In response to another question concerning whether he had formed an opinion regarding medical negligence actions, Mr. George answered: "I sometimes can't help but think that some lawyers take advantage of what become frivolous cases and the premiums doctors have to pay skyrocket and it drives some of them out of the state. On the other hand, I try to be objective about them as well." In response to another question regarding medical malpractice claims, Mr. George stated, "I will admit that I suspect there can be greed involved with the plaintiffs. However, some do have legitimate cases that stick." When asked whether negligence actions had interrupted the quality of care or increased costs, Mr. George wrote, "I think it has because of a doctor in Weirton who had to refer me to an interim [doctor] because she was trying to reassess what she was going to do because of the malpractice [situation]." Mr. George later explained that "there could be lots of doctors who leave the state because they have to pay so much for their premiums." He also stated that he was "sympathetic with [his own doctor] because . . . it's been kind of difficult for her."

*Id.* at 704–705, 671 S.E.2d at 709–710.

With respect to prospective juror Glen Stolburg in the *Jones* case, the appellants contended that Mr. Stolburg failed to accurately portray his exposure and understanding of his employer's stance on medical malpractice litigation. Mr. Stolberg was employed as a district sales manager for Ogden Publishing. The appellants maintained that:

Ogden Publishing's coverage of medical malpractice litigation had been extensive. The Appellants contend that Mr. Stolburg was untruthful in his response to a question regarding whether he had read, heard, or discussed anything about medical malpractice litigation. Mr. Stolburg had simply replied, "no." Further questioning, however, revealed that Mr. Stolburg was indeed aware of Ogden Publishing's coverage of medical malpractice issues. "I know it carried some coverage . . . well, I

know it was on the front page a few times," Mr. Stolburg stated. He also revealed that he was aware of a strike by Wheeling area physicians, their discontent with insurance premiums, and their desire to seek a cap on damages.

*Id.* at 705, 671 S.E.2d at 710. Under those facts, this Court in *Jones* concluded:

Upon this Court's independent examination of the transcript of the *voir dire* proceedings in this case, we are unable to conclude that either Juror George or Juror Stolburg made a clear statement of disqualifying bias toward Dr. Jones or Weirton Medical Center sufficient to disqualify him from serving on the jury. While we believe that the trial court was correct to conclude that the jurors' initial comments compelled further inquiry by the trial court, we find that such additional questioning revealed that each of these potential jurors was free from disqualifying bias or prejudice. The trial court competently considered the totality of the circumstances and conducted a comprehensive inquiry before determining that the jurors were competent to serve.

*Id.* at 708–709, 671 S.E.2d at 713–714.

Another recent case considered by this Court was *State v. Cowley*, 223 W.Va. 183, 672 S.E.2d 319 (2008). In *Cowley*, a prospective juror's assertion that her service might cause her to flashback to her previous experience of being sexually abused, along with her statement that she "thought" she could remain unbiased and unprejudiced, was insufficient to conclude that the circuit court abused its discretion in denying counsel's motion to strike that juror for cause. This Court held:

In this case inquiry into the juror's qualifications was made primarily by appellant's counsel-not the trial judge. A complete reading of the record in this case reveals that the juror acknowledged in clear and unequivocal terms that there are "two sides to every story" and that she could serve without any bias or prejudice.

Based upon our review of the record we cannot say that the circuit court abused its discretion in denying the appellant's motion to strike juror Melinda T. for cause.

Therefore, we find that appellant's argument with respect to this juror to be without merit.

*Id.* at 189, 672 S.E.2d at 325.

In *State v. Mills*, 219 W.Va. 28, 32–33, 631 S.E.2d 586, 590–591 (2005), the defendant contended that the circuit court abused its discretion in declining to strike two jurors for cause, thereby requiring his defense counsel to utilize two peremptory strikes to remove those prospective jurors. In that case, the prospective jurors were informed that the sentence for first degree murder was life in prison. They were thereafter asked whether they would be able to consider a life sentence with the possibility of parole eligibility after fifteen years if they found the defendant guilty of first degree murder. Two prospective jurors, Ms. Haga and Ms. George, had answered that question in the negative. When questioned further regarding that issue, prospective juror Haga indicated that she did not personally know the legal consequences of a mercy recommendation and would follow the instructions of the judge in making her determinations. She specified that she would consider the options provided to her by the court, including eligibility for parole. In refusing to strike prospective juror Haga for cause, the lower court explained that the prospective juror had initially been confused by the questions but that she was "affirmative in her statement" that she "would consider mercy[.]" 219 W.Va. at 33, 631 S.E.2d at 591.

Further inquiry of prospective juror George revealed that she would consider mercy "if there were circumstances that gave that right." *Id.* She specified that she would consider parole eligibility if so instructed by the court and that she would listen to all the evidence prior to making any decision. The lower court refused to strike prospective juror George for cause, reasoning that she indicated she would consider mercy if given the instruction to consider it. This Court in *Mills* concluded:

The remarks at issue in the present case did, at first blush, appear to create an issue of possible bias against the potential for a recommendation of mercy in a first degree murder case. In the opinion of this

Court, however, the initial responses to the questionnaire were not so clearly disqualifying as to prevent attempts at explanation, as contemplated by syllabus point five of *O'Dell*. On the contrary, the remarks appeared to have been the result of confusion on the part of the jurors caused by the questionnaire itself and were of the nature contemplated by this Court in syllabus point four of *O'Dell*, to the extent that the responses were inconclusive or vague and permitted additional inquiry into the basis for the statements. The lower court, by engaging in modest questioning, was able to ascertain the basis for the confusion.

Based upon this Court's review of this issue of prospective jurors and their alleged unwillingness to find the Appellant entitled to mercy, this Court finds no abuse of discretion by the lower court and affirms its decision with regard to these prospective jurors. Once the issues surrounding a potential recommendation of mercy were explained to the prospective jurors, their responses provided assurance to the court that they were indeed willing to follow the instructions of the court and to recommend mercy if the circumstances as proven at trial justified such a result. They demonstrated no bias or prejudice toward the accused, and the lower court's refusal to strike them for cause was not in error.

*Id.* at 34, 631 S.E.2d at 592.

Moreover, in *State ex rel. Quinones v. Rubenstein*, 218 W.Va. 388, 396, 624 S.E.2d 825, 833 (2005), the defendant contended that the trial court committed error by refusing to strike two prospective jurors from the jury panel for cause, thus requiring him to use two of his peremptory challenges to strike the jurors. One of these prospective jurors had previously retained the legal services of the county prosecutor and the assistant prosecutor assigned to the murder trial, to address legal matters associated with his business. The other prospective juror indicated he had serious concerns with people who used alcohol and drugs since both of his children had tragically died, one due to a drunk driver. Both prospective jurors indicated upon individual questioning by the circuit court that they could be fair and unbiased as jurors, and the court denied defense counsel's motions to strike them for cause. In *Quinones*, this Court concluded:

from our careful review of the record that the matters the two juror candidates originally raised did not represent prejudice beyond question so as to indicate that they had a present and fixed view of the case. Without the demonstration of such disqualifying prejudice or bias, the rule in *O'Dell* is not implicated. We further note our holding in syllabus point seven of *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995), in which we said:

A trial court's failure to remove a biased juror from a jury panel does not violate a defendant's right to a trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Section 14 of Article III of the West Virginia Constitution. In order to succeed in a claim that his or her constitutional right to an impartial jury was violated, a defendant must affirmatively show prejudice.

*Id.*

Finally, in *State v. Hutchinson*, 215 W.Va. 313, 318, 599 S.E.2d 736, 741 (2004), the defendant argued that the circuit court erred in denying his challenge for cause of prospective juror Jonathan Mullens. During *voir dire*, Mr. Mullens indicated that he was a fellow employee of potential witness Randy Toler[4] and had worked with him for approximately seven months. Mr. Toler was present during the murder of a Mr. West, which was the subject of the court proceedings. Consequently, the appellant requested that Mr. Mullens be removed from the jury panel for cause. However, his request was denied.

This Court in *Hutchinson* explained:

First, we note this is a close question on this particular juror, and therefore not an

---

4. The victim in this case has the same surname as Randy Toler, the juror discussed in *Hutchin-* *son*. These are not the same individuals.

easy one, but we cannot agree with the appellant's assertion that Mr. Mullens made "a clear statement during *voir dire* reflecting or indicating the presence of a disqualifying prejudice or bias" as we discussed thoroughly in *O'Dell.*

215 W.Va. at 319, 599 S.E.2d at 742. Then, after reviewing the principles set forth in *O'Dell,* the Court concluded that:

Based upon these standards, we find that Mr. Mullens' initial statement that he may be uncomfortable "making a decision with another man's life" not to be a statement of clear bias or prejudice. It was simply a normal reaction to jury service. Indeed, most people are initially uncomfortable imposing judgment or penalties on individuals in a criminal matter where they potentially have the power to take away a person's freedom. Nonetheless, the question is not whether a juror is uncomfortable; rather, it is whether they can put these personal feelings aside, listen to the evidence and instructions on points of law, and make a fair decision. We find no error in the circuit court's denying the motion to strike Mr. Mullens on this ground.

*Id.* We further explained in *Hutchinson:*

Likewise, we are not persuaded that Mr. Mullens' work relationship with Mr. Toler alone automatically disqualified him from serving on the jury panel. This Court has long held that, "[t]he object of the law is, in all cases in which juries are impaneled to try the issue, to secure [persons] for that responsible duty whose minds are wholly free from bias or prejudice either for or against the accused[.]" Syllabus Point 1, in part, *State v. Hatfield,* 48 W.Va. 561, 37 S.E. 626 (1900). Having thoroughly reviewed the record, we believe that, on balance, Mr. Mullens' answers during *voir dire* do not raise any doubts that he would have been able to assess the evidence in an impartial manner. In fact, he stated categorically that he could listen to Mr. Toler's testimony and weigh it just like every other witness. Thus, we find that the circuit court's failure to remove Mullens did not constitute reversible error.

*Id.* at 319–320, 599 S.E.2d at 742–743.

As previously set forth by this Court, " ' "[t]he true test to be applied with regard to [the] qualifications of a juror is whether a juror can, without bias or prejudice, return a verdict based on the evidence and the court's instructions and disregard any prior opinions he may have had." Syllabus Point 1, *State v. Harshbarger,* [170 W.Va. 401, 294 S.E.2d 254 (1982) ]' *quoting State v. Charlot,* 157 W.Va. 994, 1000, 206 S.E.2d 908, 912 (1974)." *State v. Finley,* 177 W.Va. 554, 556, 355 S.E.2d 47, 49 (1987). Moreover, in the *Finley* case this Court stated that all that is required by a trial court when it determines that prospective jurors have been exposed to potentially prejudicial information is that the trial court "shall question or permit the questioning of the prospective jurors individually, out of the presence of the other prospective jurors, to ascertain whether the prospective jurors remain free of bias or prejudice." Syllabus Point 1, in part, *Finley.*

For clarification purposes, and in light of the myriad syllabus points surrounding the issue of when to dismiss a prospective juror for cause, we now hold that: When a prospective juror makes a clear statement of bias during *voir dire,* the prospective juror is automatically disqualified and must be removed from the jury panel for cause. However, when a juror makes an inconclusive or vague statement that only indicates the possibility of bias or prejudice, the prospective juror must be questioned further by the trial court and/or counsel to determine if actual bias or prejudice exists. Likewise, an initial response by a prospective juror to a broad or general question during *voir dire* will not, in and of itself, be sufficient to determine whether a bias or prejudice exists. In such a situation, further inquiry by the trial court is required. Nonetheless, the trial court should exercise caution that such further *voir dire* questions to a prospective juror should be couched in neutral language intended to elicit the prospective juror's true feelings, beliefs, and thoughts—and not in language that suggests a specific response, or otherwise seeks to rehabilitate the juror. Thereafter, the

totality of the circumstances must be considered, and where there is a probability of bias the prospective juror must be removed from the panel by the trial court for cause.

In the present case, the record reveals that neither prospective juror McKnight nor prospective juror White stated or implied that they had formed an opinion as to the appellant's guilt or innocence. Moreover, the factual situations surrounding these two jurors are distinguishable from the situation in *O'Dell*. In this case, unlike in *O'Dell*, the circuit court did not attempt to rehabilitate either juror. In fact, the relevant questioning of these jurors protested by the appellant occurred as a result of questioning by the appellant's counsel and the prosecuting attorney—not the judge. It was during such questioning by the appellant's counsel and by the prosecutor when both jurors stated, without rehabilitative questioning from the circuit judge, that they could fairly and impartially decide the facts in the case.

■ More specifically, with regard to prospective juror McKnight, her initial response was similar to the prospective juror's response in *Thomas, supra*, who initially indicated that he might "lean toward" the testimony of a certain physician. 218 W.Va. at 238, 624 S.E.2d at 585. After further clarification, as was the case with prospective juror McKnight, the circuit court recognized that in consideration of the totality of the circumstances, there was no bias to disqualify that juror. *Id.* Likewise, the circuit court in *Jones, supra*, recognized that the initial comments of two prospective jurors "compelled further inquiry by the trial court." 222 W.Va. at 709, 671 S.E.2d at 714. After such inquiry, as was the situation with prospective juror McKnight, the circuit court found the jurors competent to serve. Moreover, as this Court specifically highlighted in *Cowley, supra*, the subsequent inquiry into that prospective juror's qualification was made by the appellant's counsel, not the circuit judge. 223 W.Va. at 189, 672 S.E.2d at 325. Similarly, as previously stated, the subsequent inquiry into prospective juror McKnight's qualification was made by the prosecutor and not the circuit judge.

■ With regard to prospective juror White, her sensitivity to sitting on a jury where a defendant was being charged with murder is not an uncommon reaction to jury service. This case is similar to *Mills, supra*, where the circuit court recognized that a prospective juror had initially been confused by the questions. 219 W.Va. at 33, 631 S.E.2d at 591. Prospective juror White's situation is also analogous to the prospective juror in *Quinones, supra*, who was concerned with the nature of the underlying charge based upon his personal experiences. 218 W.Va. at 396, 624 S.E.2d at 833. Perhaps even more on point was the prospective juror in *Hutchinson, supra*, who initially stated that he may be uncomfortable "making a decision with another man's life." 215 W.Va. at 319, 599 S.E.2d at 742. As was the result with prospective juror White, the prospective juror in *Hutchinson* demonstrated that he was able to put those feelings aside, listen to the evidence and instructions on points of law, and make a fair decision. Moreover, as was the situation with prospective juror White, the concern expressed by the prospective juror in *Hutchinson* was found "not to be a statement of clear bias or prejudice." 215 W.Va. at 319, 599 S.E.2d at 742.

This Court explained in *State v. Miller*, 197 W.Va. 588, 605, 476 S.E.2d 535, 552 (1996), that "[i]n determining whether a juror should be excused, our concern is whether the juror holds a particular belief or opinion that prevents or substantially impairs the performance of his or her duties as a juror in accordance with the instructions of the trial court and the jurors' oath." Neither of these jurors expressed any beliefs or opinions that could logically lead to the conclusion that they would be unable to follow the instructions of the trial judge. Moreover, in consideration of the totality of the circumstances as well as a thorough reading of their entire *voir dire*, both jurors acknowledged in clear and unequivocal terms that they could serve without any bias or prejudice. Thus, based upon our review of the record we cannot say that the circuit court abused its discretion in denying the appellant's motion to strike prospective jurors McKnight and White for cause, and therefore, we find the appellant's

argument with respect to these jurors to be without merit.

### B. Introduction of Statement

■ The appellant contends that two statements he made in response to questioning by an EMT were admitted into evidence at trial in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[5] The first statement was made by the appellant at the scene of the crime after he was handcuffed by Deputy Harvey and while he was being examined by Ray Bryant, an EMT, who was also an off-duty City of Man police officer. Deputy Harvey testified at the suppression hearing that he overheard the appellant make inculpatory statements to Mr. Bryant. Specifically, he testified as follows:

Q. You said that there were two statements by the [appellant]. One is "Yeah, I stabbed him." Then the other is "he deserved it" or something like that.

A. He said, did you stab that guy up there and he said "Yes." He said, well, that guy up there is dead.

Q. That is what I'm asking. He who, Ray Bryant, "he" being Ray Bryant.

A. Said, "Did you stab that guy?"

Q. And he said, "Yeah."

A. [The appellant] said, "Yes."

Q. Did Ray Bryant Say anything else?

A. No sir. Well yes, he said, "That guy is dead up there."

Q. He said, "That guy is dead."

A. Right

Q. Ray Bryant said that?

A. Yes, sir.

Q. Then the defendant said?

A. That's what the mother-fucker gets.

Q. So that wasn't a question. That was the [appellant] making a statement.

A. Right.

The second statement that the appellant contends was improperly admitted at trial was made directly to Deputy Harvey. Deputy Harvey testified that:

[The appellant] was rambling on, the statement; I don't know if it was when I just took him to the car, when I[was] walking him to the car to get him checked out. But he was going on "how would you feel if your wife spent all your money on drugs and this SOB screwing your wife and giving her drugs."

The appellant contends that neither statement should have been admitted at trial because they were made prior to his arrest and before he was given the *Miranda* warnings. The appellant argues that Bryant exceeded his role as an EMS worker and slipped into the role of criminal investigator. In response, the State acknowledges that the appellant made various statements upon being questioned by Mr. Bryant before he was arrested and given the *Miranda* warnings. The State maintains, however, that the statements were not made pursuant to police questioning and were properly admitted at trial.

■ In *State v. Guthrie*, 205 W.Va. 326, 332, 518 S.E.2d 83, 89 (1999), we explained that:

Concerning our standard of review of the circuit court's exclusion of the evidence at issue, we note that " '[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, [643,] 301 S.E.2d 596, 599,

---

**5.** In *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966), the United States Supreme Court set forth the requirements for interrogating a suspect as follows:

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either

retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

(1983)." Syl. pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983).

In *Rhode Island v. Innis,* 446 U.S. 291, 300–302, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980), the United States Supreme Court held:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Thereafter, in Syllabus Point 8 of *Guthrie, supra,* this Court explained that:

> The special safeguards outlined in *Miranda* are not required where a suspect is simply taken into custody, but rather only where a suspect in custody is subjected to interrogation. To the extent that language in *State v. Preece,* 181 W.Va. 633, 383 S.E.2d 815 (1989), and its progeny, may be read to hold differently, such language is expressly overruled.

In reviewing the record as a whole, it is clear that statements made to the EMT were made as a result of a question posed by someone who was not a police officer at the time, and not as a result of a custodial interrogation by the police. Regardless of the fact that the EMS worker was a part-time police officer, he was clearly performing his duties as an EMS worker when any statements were made by the appellant. Thus, the *Miranda* safeguards were not triggered, and the statements were properly admitted as evidence.

It is important to review the events leading up to Deputy Harvey allowing the EMT to examine the appellant. As Deputy Harvey arrived at the scene, he noticed Mr. Toler lying on the floor in the house. Thereafter, he observed Ms. Newcomb outside screaming, "There he is, there he is," followed by the appellant standing near the road yelling, "you want me, you want me, here I am, come and get me." At that same point, the victim's parents were pointing to the appellant and screaming, "There he is, there he is." As the appellant started to come toward Deputy Harvey, the deputy told the appellant to get on his knees and show his hands. At first, the appellant did not comply, but moments later he did. Due to the fact that the appellant initially refused to comply with his orders, and by the fact that the officer was not fully aware of what was going on in the situation, he handcuffed the appellant. Deputy Harvey stressed that the appellant was not under arrest at that point in time and that he placed handcuffs on the appellant as a part of proper protocol for safety reasons due to his being combative and the officer's lack of knowledge of the surrounding facts. It was at that moment when Deputy Harvey took the appellant to his police cruiser where he had an EMS worker examine him.

In ruling in favor of the State regarding the appellant's statements to the EMT, the circuit judge stated the following:

> There is no evidence presented to the Court by which the Court could take judicial notice of Mr. Bryant's time that he may or may not have served as a police officer. The testimony before the Court is that Mr. Bryant was one of the EMS attendants that had been called to the scene when the emergency call came in and that after the Defendant was hand-

cuffed by Deputy Harvey, he was taken to Mr. Bryant for an initial evaluation of whether he might need any medical treatment.

At that time, Mr. Bryant was evaluating him as an EMS attendant, Emergency Medical Service attendant, asked him if he had been the individual that had stabbed the other person involved, and Mr. Newcomb, the Defendant, voluntarily responded that he had. There is no evidence that Ray Bryant was engaged by the police to assist in their investigation or was prompted in trying to get information from the Defendant or was acting as an Agent of the police at that time.

The Defendant's response to that question posed by Mr. Bryant would be admissible in the State's case-in-chief. That was a statement directly overheard by Deputy Harvey to Ray Bryant.

The testimony further indicates that upon hearing that, that Ray Bryant informed the Defendant that the person who had been stabbed had in fact passed away and that was a statement not prompting a response. The response made by the Defendant was unsolicited and not as a result of any interrogation and given when Mr. Bryant wasn't acting as an Agent for the police so Mr. Newcomb's response would likewise be admissible.

The situation wherein a defendant has made statements to individuals who were not acting as agents for the police is not an issue of first impression. For instance, the Court in *People v. Jones,* 169 A.D.2d 986, 565 N.Y.S.2d 262, 264–265 (1991) addressed the issue of the admissibility of statements made by a defendant to an ambulance driver and a nurse. Regarding the defendant's statements to an ambulance worker, the Court in *Jones* explained:

Thereafter defendant made statements to an ambulance worker while being treated. Defendant contends that the statements are inadmissible ... We disagree.... A private person may acquire information to be used in a criminal investigation even where police would be constitutionally restrained. Further, there is no evidence in the record from which it could be inferred

that the ambulance worker was a police agent. The statements were voluntarily made and were thus admissible.

*Id.* The Court in *Jones* then addressed the defendant's statement to a nurse which was overheard by the police as follows:

Defendant also seeks to suppress a statement made by defendant to a nurse and overheard by the police. Where a statement is made in the presence of police which was not induced, provoked or encouraged by the police, it can be admitted into evidence (*People v. Harris,* 57 N.Y.2d 335, 456 N.Y.S.2d 694, 442 N.E.2d 1205). The record indicates that the officer was standing by while defendant was being treated and overheard defendant's unsolicited and incriminatory statement made to the nurse. Such statement is admissible.

565 N.Y.S.2d at 265. *See also People v. Esmail,* 260 A.D.2d 396, 688 N.Y.S.2d 186, 188 (1999) ("Contrary to the defendant's contention, the testimony at the hearing did not establish that the emergency medical service workers were acting as agents of the police. Accordingly, suppression of the defendant's statement to the EMS workers was properly denied."); *In re W.R.,* 363 N.C. 244, 675 S.E.2d 342, 344 (2009) ("Because *Miranda* is limited to custodial interrogations, statements made to private individuals unconnected with law enforcement are admissible so long as they were made freely and voluntarily. Even if the person occupies some official capacity or position of authority, *Miranda* does not apply to questioning by such persons unless the person is acting as an agent of law enforcement."); *Escamilla v. State,* 143 S.W.3d 814, 824 (Tex.Crim.App.2004) ("Appellant claims in point of error ten that the trial court erroneously admitted into evidence appellant's custodial oral statements to hospital personnel who were treating appellant's injuries. Appellant claims that they were state agents.... The ... statements were not the result of 'interrogation' by law enforcement personnel or their agents."); *Reinert v. Larkin,* 211 F.Supp.2d 589, 601 (E.D.Pa.2002) ("Reinert's initial inculpatory statement was made in response to the paramedic's questioning. Reinert argues, however, that the presence of police, combined with

his physical condition at the time, restricted his movement. He contends that he was therefore subjected to a custodial interrogation. Although police officers were present when medical personnel conducted the questioning that prompted Reinert's admission, their mere presence does not transform the situation into a custodial interrogation. Reinert also argues that he was entitled to *Miranda* warnings because the paramedic questioned him as an agent of the police, but he cites no case law to support this argument. The state court determination that Reinert's Fifth Amendment rights were not violated by the admission of his pre-*Miranda* statement was not an unreasonable application of *Miranda*. Therefore, *habeas* relief is not merited on this claim. Reinert's objection is overruled.").

In light of the aforementioned, the fact remains that Mr. Bryant was performing his duties as an EMS worker when this occurred. Deputy Harvey testified that Mr. Bryant was treating the appellant and that he was at the scene in his EMS capacity and not in his police capacity. Accordingly, there was no abuse of discretion on the part of the circuit court with regard to this issue.

 With regard to the so-called rambling statement made by the appellant, in which he said, "How would you feel if your wife spent all your money on drugs and this SOB was screwing your wife and giving her drugs," Deputy Harvey explained that the statement was made during the time period when he had the appellant handcuffed and was taking him to his police cruiser due to the fact that he was being combative. Deputy Harvey also stated that he detained the appellant at that time for his own safety which was proper police protocol as he secured the crime scene and tried to ascertain the underlying facts. In ruling the statement admissible, the circuit court stated the following:

With regard to this statement made in the presence of Deputy Harvey, the Defendant was in custody but this was not as a result of any sort of interrogation. These were utterances made by the Defendant, not prompted by any questioning from the officer and they were voluntarily made, there is no evidence to indicate any intoxication or impairment of the Defendant. He was excited and upset, somewhat belligerent and non-compliant but *Miranda* applies to avoid an interrogation and so that series of statements which are referred too [sic] by Officer Harvey as rambling on the by the Defendant would be admissible in the State's case-in-chief.

The record supports the conclusion that the statement by the appellant, while made prior to *Miranda* warnings, was unsolicited and not as a result of a custodial interrogation by Deputy Harvey. Thus, there was no abuse of discretion in its admission at trial.

### C. Introduction of Murder Weapon

 The appellant next argues that the circuit court erred by allowing the murder weapon to be admitted into evidence at trial. While the appellant was handcuffed and sitting in the police cruiser at the crime scene, he was asked by police officers about the location of the knife that he used to stab Mr. Toler. The appellant eventually led the police to the riverbank where he had thrown the knife. Prior to trial, the circuit court ruled that the appellant's statements to the police regarding the location of the knife were inadmissible because the appellant had not been given the *Miranda* warnings prior to being questioned about the matter. However, the circuit court found that the knife itself could be admitted into evidence. In this appeal, the appellant argues that the knife should have been excluded pursuant to the fruits of the poisonous tree doctrine. *See State v. George Anthony W.*, 200 W.Va. 86, 488 S.E.2d 361 (1996).[6]

---

6. Under the fruits of the poisonous tree doctrine " '[e]vidence which is located by the police as a result of information and leads obtained from illegal[ ] [conduct], constitutes the fruit of the poisonous tree' and is ... inadmissible in evidence.' " *State v. Stone*, 165 W.Va. 266, 272, 268 S.E.2d 50, 54–55 (1980) (*quoting French v. State*, 198 So.2d 668 (Fla.Dist.Ct.App.1967)). The fruits of the poisonous tree doctrine was first announced by the United States Supreme Court in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Wong Sun*, the defendant's fourth amendment rights were violated when the police arrested him in his

In response, the State argues that the appellant was not actually questioned about the location of the knife. Rather, as Deputy Harvey testified, the appellant "blurted out" that he threw the knife over the road while he was taking him to the police cruiser. Thus, the State reasons that there was no *Miranda* violation. Alternatively, the State argues that the knife would have been discovered regardless of the appellant's voluntary statement, and therefore, pursuant to the inevitable discovery doctrine, the knife was properly admitted into evidence at trial.

In Syllabus Point 3 of *State v. Flippo*, 212 W.Va. 560, 575 S.E.2d 170 (2002), this Court held that:

> Under the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule if it is shown that the evidence would have been discovered pursuant to a properly executed search warrant.

In Syllabus Point 4 of *Flippo*, this Court further explained that:

> To prevail under the inevitable discovery exception to the exclusionary rule, Article III, Section 6 of the West Virginia Constitution requires the State to prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct.

Assuming, *arguendo*, that the appellant was questioned about the location of the knife before he was given the *Miranda* warnings, it is clear to this Court that all three factors of the *Flippo* test were satisfied. As Deputy Sutherland testified, regardless of any statement from the appellant, the police

officers would have canvassed the area with metal detectors and would have eventually found the knife. Moreover, Trooper Sparks explained that the knife was found in a field area, and was located in an upright position with the knife handle visible as the knife blade was stuck in the mud. He further said it would have been found easily in daylight as it was in the general area of where the appellant was found when officers first arrived at the scene and, thus, the probability of inevitable discovery was great. Moreover, Deputy Robinette stated that the knife was not hidden or concealed in any way when it was located in the open field.

With regard to the admission of the knife into evidence, the circuit court stated the following:

> Any reference that the Defendant indicated to Trooper Sparks the general location of the knife, there was testimony from Deputy Robinette that Trooper Sparks brought the Defendant back down to the location where they were searching, and the Defendant pointed out where the knife generally was, so any reference by Deputy Robinette, Trooper Sparks denied that, but any reference that it was the Defendant that pointed that out would be suppressed in the State's case-in-chief.
>
> However, I believe that when the search was started, it was dark. They had the general location of where the Defendant had been. There was information that he did not have a vehicle on the scene, and I believe the inevitable discovery rule test is met, so the State can use the knife in its case-in-chief.

As we explained in *Guthrie, supra,* questions regarding the admissibility of evidence are within the sound discretion of the circuit court and are to be disturbed only when there is an abuse of discretion. There was no abuse here. The murder weapon was in plain view and located in a very close proximity to where the appellant was apprehended,

---

home without probable cause or reasonable grounds to do so. In making the arrest, the police found narcotics. The Supreme Court held that the narcotics which were derived from the illegal arrest must be excluded from the defendant's trial as "fruits of the poisonous tree." 371

U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455. In *State v. Bradshaw*, 193 W.Va. 519, 540, 457 S.E.2d 456, 477 (1995) we observed, however, that "absent a constitutional violation, the 'fruits of the poisonous tree' doctrine has no applicability.' "

and in such a position that a later police search would necessarily have found it regardless of the appellant's statement. Accordingly, the circuit court's ruling that the knife could be introduced into evidence pursuant to the inevitable discovery doctrine was not an abuse of discretion.

### D. Prompt Presentment Rule

■ Next, the appellant argues that the circuit court improperly ruled in two separate suppression hearings that there was "no prompt presentment violation." The appellant states that the facts support the conclusion that the primary reason for the delay in taking him to the magistrate court was to obtain a confession and, thus, the circuit court's findings were clearly erroneous.

According to the State, Deputy Sutherland was the primary investigator in the appellant's case and arrived on the scene at 4:44 a.m. As soon as Deputy Sutherland arrived, he immediately began processing the scene and it was approximately 6:23 a.m. when he came out of the house to arrest the appellant and take a statement from him. Then, according to the State, once *Miranda* warnings were given, the appellant declared that he did not need a lawyer because whatever he told the police officer would be the same as what he would tell his lawyer. The State further explains that during the nearly one-and-one-half-hours from the time the police first arrived at the scene and the taking of the appellant's statement, the appellant was sitting in Deputy Harvey's police cruiser. As discussed previously, Deputy Harvey handcuffed the appellant and placed him in his cruiser; however, he did not immediately place him under arrest because he had just arrived at the scene and did not know the underlying circumstances at that point in time. Nonetheless, based on the appellant's behavior, as well as proper police protocol, he stated that he placed handcuffs on the appellant for safety reasons.

■ In Syllabus Point 6 of *State v. Johnson*, 219 W.Va. 697, 639 S.E.2d 789 (2006), we held that:

> " ' "The delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissable] where it appears that the primary purpose of the delay was to obtain a confession from the defendant." Syllabus Point 6, *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982), as amended.' Syllabus Point 1, *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984)." Syl. Pt. 8, *State v. Milburn*, 204 W.Va. 203, 511 S.E.2d 828 (1998).

The record before us shows that the appellant was kept at the scene of the crime for legitimate law enforcement purposes, and not kept there for the purpose of getting a confession. This Court has held that delays of more than two hours and even thirteen hours were not violations of the prompt presentment rule. *See Johnson, supra;* and *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971), respectively. Moreover, in Syllabus Point 2 of *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989), this Court held:

> " 'Ordinarily the delay in taking an accused who is under arrest to a magistrate after a confession has been obtained from him does not vitiate the confession under our prompt presentment rule.' Syllabus Point 4, *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986)." Syllabus Point 8, *State v. Worley*, 179 W.Va. 403, 369 S.E.2d 706, cert. denied, 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988).

With regard to the appellant's contention that there was a prompt presentment violation, the circuit court made the following ruling:

> There was no prompt presentment issue. The Defendant's argument is illogical. To follow it would mean that either one, when as soon as Deputy Sutherland placed the Defendant under arrest he would have to make an election either to leave the crime scene at that point and time and take the Defendant immediately to the courthouse and at 6:30 in the morning there would not have been a magistrate in anyway. They don't come in until 8:30; or, to jail, and give up the opportunity to further process the crime scene.
>
> Or, if he stayed at the crime scene to give up any right to interview the Defen-

dant to try and further ascertain what had happened. So neither of those scenario's [sic] make sense and I believe Deputy Sutherland acted properly in making the decision to leave the Defendant in the cruiser, process the crime scene and then it certainly is well within his purview as an officer to try and take a statement after giving the Defendant his rights and giving him an opportunity to exercise those rights which the Defendant chose not to do.

So the motion to suppress will be overruled with the exception of anything that the Defendant might have said when Deputy Sutherland first approached him, has not been—Deputy Sutherland would not remember it so the State would be precluded from bringing that up later on if Deputy Sutherland's memory is refreshed.

In this case, as previously discussed, after being held for a brief and reasonable amount of time as officers secured the scene of the crime, the appellant made a voluntary statement *after* he was given his *Miranda* warnings. This Court has held that a delay in presenting a defendant to a magistrate after he has confessed does not violate the prompt presentment rule because the purpose of the rule is to avoid prolonged interrogation in order to coerce a confession. In *State v. Whitt*, 184 W.Va. 340, 345, 400 S.E.2d 584, 589 (1990), we explained:

> Under our prompt presentment rules, W.Va.Code, 62–1–5,[7] and Rule 5(a) of the Rules of Criminal Procedure,[8] we have recognized that the delay in transporting a defendant to police headquarters and the time consumed in routine processing is not

critical for prompt presentment purposes. *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982). In several other cases, we have found that a delay in presenting the defendant to a magistrate after he has confessed does not violate our prompt presentment statute either, because the purpose of the statute is to avoid prolonged interrogation in order to coerce a confession. *State v. Hutcheson,* 177 W.Va. 391, 352 S.E.2d 143 (1986); *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986).

In light of all of the above, it was clearly established that the delay that occurred in bringing the appellant before a magistrate was not for the primary purpose of obtaining a confession from him. As such, there was no abuse of discretion on the part of the circuit court in admitting this evidence.

### E. W.Va. R. Evid. 404(b)

■■■■ In his final argument, the appellant maintains that the State introduced testimony in violation of Rule 404(b)[9] of the West Virginia Rules of Evidence. In particular, the appellant claims that the circuit court should have excluded testimony concerning the fact that the appellant had stabbed the victim on an earlier occasion in September 2005. The September 2005 stabbing occurred nearly five months prior to the April 1, 2006, fatal stabbing of the victim. The appellant also maintains that the admission of such evidence was unfairly prejudicial to him under Rule 403.[10] He states that while he was initially charged for malicious assault for that September 2005 stabbing,

---

7. W.Va.Code § 62–1–5(a)(1), provides, in part: "An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence or as otherwise authorized by law, shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made."

8. Rule 5(a) states, in part: "An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before a magistrate within the county where the arrest is made."

9. Rule 404(b) of the West Virginia Rules of Evidence provides:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

10. Rule 403 of the West Virginia Rules of Evidence provides:

Although relevant, evidence may be excluded if its probative value is substantially out-

those charges were dismissed without prejudice. As such, he contends that he was forced to defend both charges in this case even though the two incidents were separate. He states that allowing such evidence to be presented was misleading and confusing for the jury.

The State contends that presentation of the evidence of the prior stabbing of the victim was properly allowed under the Rule 404(b) exception to the prohibition of introducing other crimes, wrongs, or acts. At the suppression hearing, the State explained that the prior stabbing involved the same appellant, the same victim, the same incident, and the incident occurred within five months of the murder. Thus, the State asserted that the evidence went to show motive, intent, plan, and lack of mistake or accident. Moreover, the State notes that the circuit court gave a proper limiting instruction before the evidence was introduced and during the jury charge at the end of the trial.

Having reviewed the record below, the circuit court did not err in allowing the State to introduce the evidence concerning the September 2005 stabbing. In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), this Court explained the standard of review for a Rule 404(b) issue as follows:

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review de novo whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

196 W.Va. at 310–311, 470 S.E.2d at 629–630 (footnote omitted).

 Moreover, in Syllabus Point 2 of *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), this Court outlined the procedure that trial courts must follow in determining whether to admit Rule 404(b) evidence:

> weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Finally, in Syllabus Point 1 of *McGinnis*, we addressed the use of Rule 404(b) evidence as follows:

> When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose

> time, or needless presentation of cumulative evidence.

alone must be told to the jury in the trial court's instruction.

193 W.Va. 147, 455 S.E.2d 516.

In the case at hand, during the March 27, 2007, suppression hearing, the prosecutor gave specific, detailed purposes for the introduction of this evidence, rather than merely mentioning a litany of possible Rule 404(b) uses, as is the mandate of *McGinnis*. During the suppression hearing, the State argued the following regarding the introduction of the evidence of the prior stabbing of the victim:

> I know that the Court is well familiar with the rule and law surrounding that [Rule 404(b)]. The State must show that it bears to motive and intent, lack of intent, things of that nature. Clearly here we have in a period of from September 2005, until April of 2006, roughly five (5) months. Five and a half months later, this same Defendant, attacked this same Victim in a manner nearly identical to the manner in which we allege he killed Paul Toler and that is repeated stabbing.
>
> . . .
>
> Simply stating, again, you have the same Defendant, same Victim, same incident occurring within five (5) months of this trial or I'm sorry, this incident. We believe that would go directly to motive, showing that he had some jealousy or some previous incident or occurrence with his wife that caused him to attack Mr. Toler on that occasion. It is the same that led him to attack Mr. Toler that night here in Logan County six months later.
>
> It would go to lack of mistake. It would go to the identity of the Defendant and as far as motive goes, I believe that there is obvious motive and the State will present evidence, be able to present evidence, that this Defendant was aware that he was possibly going to be in trouble or be indicted for that charge in Mingo County and that this may have been an attempt to—I think the State would be allowed to argue that this may have been an attempt to silence the witness against him over there as this case may further develop at trial, based on how these witnesses testify. Johnna Newcomb at the time has given inconsistent testimony but it may well be that there was some plan or something on

the part of both of them to do this to Mr. Toler. She gave the statement to the police and I know that the Court does not have that in front of it but again, recanted that statement at the preliminary hearing in this case.

> Again, clearly, the same Victim. Same Defendant, same act five months earlier and I think it fits nearly every category of the Rule 404(b) exceptions and we'd ask the Court to allow the State to use that in its case-in-chief with the limiting instruction the Court would give as it deems proper.

Our review of this matter does not indicate any abuse of discretion by the circuit court, nor do we find that the circuit court acted in an arbitrary or irrational manner. The State presented detailed, specific purposes for the 404(b) evidence in accordance with *McGinnis, supra*, establishing explanations and rationales for the admission of such evidence. Moreover, as per the requirement set forth in *McGinnis* that a circuit judge must give a limiting instruction to the jury as to the purpose of the introduction of Rule 404(b) evidence, the circuit court gave such an instruction. In fact, the circuit court gave the instruction both prior to the evidence being introduced, as well as during the charge to the jury at the conclusion of the trial. Under the standard of review established in *LaRock, supra*, as well as the procedures set forth in *McGinnis*, there was a clear factual basis for this evidence, it was established that it was given for a legitimate purpose, and there was no abuse of discretion with respect to its probative value outweighing any prejudice. We consequently affirm on this ground.

## IV.

## CONCLUSION

For the reasons stated above, we affirm the decision of the Circuit Court of Logan County entered on August 3, 2007.

Affirmed.

Justice BENJAMIN concurs and reserves the right to file a concurring opinion.

BENJAMIN, Chief Justice concurring:

I concur with the majority decision to affirm the appellant's conviction. However, I

write separately because I believe the appellant's statement to Ray Bryant, an EMT, was made during a custodial interrogation.

First, it is clear that the appellant was in custody when the statement at issue was made in that he had been handcuffed by Deputy Harvey. Therefore, a reasonable person in the appellant's position would have considered his freedom curtailed to a degree associated with a formal arrest. Also, it is significant that the appellant made the admission that he stabbed the victim in response to Mr. Bryant's direct interrogatory "Did you stab that guy?" Mr. Bryant's question is the type of inquiry that a law enforcement officer would make pursuant to the investigation of a crime and not the type of question that a healthcare worker would ask pursuant to treatment. Of further significance is the fact that Mr. Bryant was also a part-time police officer. In this situation, the notion that Mr. Bryant changed roles from a law enforcement officer to an EMT as easily as he changed uniforms is not consistent with human nature. When Mr. Bryant asked the appellant whether he stabbed the victim, Mr. Bryant was aware of the ongoing police investigation into the stabbing, he was aware that the appellant was most likely a suspect because he was in handcuffs, and he was aware that Deputy Harvey was present and was privy to any statement made by the appellant. For these reasons, I believe that the appellant was subjected to a custodial interrogation when he admitted that he stabbed the victim. Because this interrogation occurred before the appellant was *Mirandized,* his statement should not have been admitted at trial.

However, regardless of my belief that the appellant's statement was improperly admitted at trial, I believe that the admission constitutes harmless error. It is clear to me in light of the substantial evidence of guilt that the error in admitting the appellant's statement to Mr. Bryant did not prejudice the appellant at trial. Accordingly, I concur.